**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLAST OFF MEDIA INC., | Civil Action No. |
| Plaintiff, | **FILED UNDER SEAL** |
| -against- | |
| DOWNTOWN MUSIC CAPITAL, LLC, DOWNTOWN MUSIC LLC, and DOWNTOWN MUSIC HOLDINGS LLC, | **COMPLAINT** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Blast Off Media Inc. ("Blast Off"), by and through its counsel Quinn Emanuel Urquhart & Sullivan, LLP, brings this Complaint against Defendants Downtown Music Capital, LLC ("DMC"), Downtown Music LLC, and Downtown Music Holdings LLC (collectively, "Downtown" or "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.    This case involves the calculated destruction of a rapidly-growing independent music business by a large company (and its affiliates) seeking to escape an agreement they determined to be financially and/or strategically disadvantageous by manufacturing a pretext for termination.

2.    In August 2025, Defendants induced Blast Off to enter into a YouTube Monetization Agreement ("the Agreement")[1] by promising ███████ to Blast Off to secure the right to provide monetization services for Blast Off's extensive music catalog, which appears in videos that generate over 1 billion views per day on YouTube. In exchange,

---

[1]  The Agreement is attached hereto as Exhibit 1. Capitalized terms used but not defined herein have the meanings set forth in the Agreement.

Defendants received the ███████ right to monetize Blast Off's sound recording rights[2] on YouTube and earn a share of the revenue.

3.     Defendants made numerous representations to induce Blast Off to enter the Agreement, including that Defendants had superior relationships with YouTube and could manage any compliance issues that might arise. These representations were quickly shown to have been false.

4.     Barely one month after the Agreement was signed—an Agreement that was meant to have a term of ██████████████████—and without providing the contractually-required ███████████████████████████████, Defendants purported to terminate the Agreement, effective immediately, demanded return of a ████████ advance they had made on the ████████ promised, and froze all revenue payments owed to Blast Off. This included approximately $1.65 million earned in July and August 2025 under a predecessor agreement Defendants assumed, plus substantial additional earnings for September 2025, when Blast Off's catalog was generating approximately $42,500 per day and experiencing 30% month-over-month growth (not including Blast Off's separate, lucrative publishing rights revenue).

5.     Defendants' purported reasons for terminating—supposed breaches of YouTube policies by Blast Off—are baseless and pretextual. Out of approximately 800 music tracks in Blast Off's public music catalog that appear in hundreds of thousands of YouTube videos, Defendants identified *only two instances* involving *only two tracks* that had allegedly been used by individuals *unaffiliated with Blast Off* in a way that violated YouTube's policies.

---

[2]  Content owners have distinct music publishing rights and sound recording rights in their songs, which generate different royalties.

Even as to the use of those two tracks, Defendants: (i) failed to identify any wrongdoing by Blast Off as opposed to by third-party content creators over whom Blast Off has no control; (ii) ignored Blast Off's extensive good-faith compliance efforts, including proactive identification and removal of problematic content and implementation of AI-powered monitoring systems; and (iii) refused to allow Blast Off the contractually-mandated ████ ██████████

6.     Most egregiously, Defendants unilaterally de-listed *all songs* of Blast Off's 800-track catalog from YouTube—immediately rendering the entire catalog unusable and thus valueless for its intended purpose.  This action, which effectively can be undone only by Defendants absent YouTube's manual review and re-approval, has: (i) destroyed a YouTube music catalog valued between $200 and $300 million; (ii) "poisoned" the catalog, as other distribution services now refuse to do business with Blast Off related to that YouTube catalog because they assume the de-listing was justified; and (iii) displaced Blast Off's network of over 20,000 YouTube content creators.  Under the guise of having terminated the Agreement, Defendants are also allowing competing claims to be placed on Blast Off's tracks by competitors, causing further damage to Blast Off's business and reputation.

7.     The timing and nature of Defendants' actions reveal their true motives.  On information and belief, Defendants are seeking to protect their interests in a controversial acquisition of Downtown by Virgin Music Group (a division of Universal Music Group ("UMG")).  That acquisition—valued at $775 million—is under review by the European Commission.[3]  On information and belief, Downtown decided to divest itself of Blast Off out

---

[3]  *See* https://www.musicbusinessworldwide.com/eu-restarts-probe-into-universals-775m-downtown-deal-sets-new-deadline-to-make-decision/.

of concerns that the Agreement could somehow complicate the merger.

8.      For example, Downtown's entire business model depends on maintaining YouTube Content Management System ("CMS")[4] access. Losing YouTube CMS access would render Downtown worthless to UMG. Blast Off's scale and 30% monthly growth created escalating risk that any perceived YouTube policy issues—whether legitimate or not—could trigger CMS suspension and, in turn, sour UMG's views of Downtown.

9.      As soon as a singular, minor issue with YouTube arose—the same type Defendants repeatedly represented to Blast Off they had the ability to navigate—Defendants panicked. Rather than work with Blast Off to resolve the issue, Defendants sought to terminate the Agreement. The alleged "breach" by Blast Off (attributable to, at most, two specific instances of third parties' use of two tracks) that purportedly justified the October 2, 2025 termination "notice" by Defendants bears no rational relationship to Defendants' response (i.e., complete destruction of Blast Off's catalog on YouTube and seizure of all related assets and revenues).

10.     Moreover, on information and belief, Defendants had come to view the deal as commercially unfavorable—in essence, they had buyer's remorse. Blast Off's September 2025 growth rate (30% month-over-month) meant that Blast Off was projected to earn hundreds of thousands of dollars per day by 2026. The Agreement gave Downtown only ▓▓ of these revenues (quickly dropping to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓), but the fast-increasing scope and scale of Blast Off's business meant that Defendants' operational burdens were increasing faster that expected.

---

[4]  YouTube's CMS system is a suite of tools that allows content owners or their partners to manage their content on YouTube.

11.     The evidence of pretext is overwhelming:  Defendants (i) terminated after only 34 days of a ████████████ term; (ii) terminated immediately after Blast Off's highest-growth month on record (30% in September 2025); (iii) provided no meaningful opportunity to cure despite ████████████████████████ and Blast Off's demonstrated good-faith compliance efforts; (iv) seized at least $1.65 million in revenues earned under the predecessor agreement; (v) failed to allege any specific damages they suffered or explain why two isolated instances involving only two tracks, out of more than 800 in Blast Off's catalog, justified destroying 100% of Blast Off's catalog on YouTube, particularly where one of the two tracks was used in approximately 84,000 Shorts videos and only a single instance was ever flagged, representing far less than 0.001% of total content using the catalog; and (vi) after realizing their initial purported grounds for termination were bogus after Blast Off clearly highlighted the deficiencies to them in writing, invented brand new excuses in a letter sent 20 days later.

12.     Accordingly, Blast Off brings this action for fraudulent inducement[5], breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, conversion, tortious interference with business relations, intentional interference with prospective economic advantage, and injunctive and declaratory relief.

### JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship, and the amount in controversy exceeds $75,000.

---

[5] Although the Agreement contains an arbitration provision, such provisions do not bar lawsuits in courts under New York law where, as here, the Agreement was "induced by fraud." *Adago v. Sy*, 205 A.D.3d 602, 603 (1st Dep't 2022).

14.     The Court has personal jurisdiction over Defendants, including under CPLR §§ 301 and 302(a), because they maintain their principal place of business in New York, New York, regularly do and solicit business within the State of New York, and/or expected or reasonably should have expected that their acts would have consequences within the State of New York.

15.     Venue in this Court also is proper under 28 U.S.C. § 1391(b) because each of the Defendants resides in this District. Furthermore, a substantial part of the events and omissions giving rise to Blast Off's claims occurred in this District.

## THE PARTIES

16.     Blast Off is a corporation organized under the laws of Canada with its principal place of business at 100 Cougar Ridge Close SW, Calgary, AB, Canada T3H0V4.

17.     On information and belief, Defendant Downtown Music Capital, LLC ("DMC") is a Delaware limited liability company with its principal place of business at 155 Avenue of the Americas, New York, New York 10013. On information and belief, DMC is a subsidiary of Defendant Downtown Music Holdings LLC.

18.     On information and belief, Defendant Downtown Music LLC is a Delaware limited liability company with its principal place of business at 155 Avenue of the Americas, 15th Floor, New York, New York 10013. On information and belief, Downtown Music LLC operates as an affiliate within the Downtown corporate group and participates in or exercises control over the operations, contractual relationships, and strategic decisions of DMC.

19.     On information and belief, Defendant Downtown Music Holdings LLC is a Delaware limited liability company and the ultimate parent company of the Downtown group, with its principal place of business at 155 Avenue of the Americas, New York, New York

10013.  On information and belief, Downtown Music Holdings LLC is currently in the process of being acquired by Virgin Music Group (a division of UMG) for $775 million.  That transaction remains subject to regulatory review and approval by the European Commission.

20.  On information and belief, DMC, Downtown Music LLC, and Downtown Music Holdings LLC operate as part of a unified enterprise with shared management, revenue systems, compliance infrastructure, and Content ID account authority.  On information and belief, Downtown Music Holdings LLC is the ultimate controlling entity of the Downtown group and exercised oversight and direction over the conduct at issue.  All Defendants are jointly and severally liable for the breaches and torts alleged herein.

## FACTUAL BACKGROUND

### The YouTube Content ID System

21.  YouTube operates a sophisticated Content Management System (CMS) that allows copyright holders to control how their music is used on the platform.  When a creator uploads a video to YouTube, the system automatically scans it against a database of registered audio and video files—called "fingerprints"—to detect copyrighted content.

22.  Copyright owners who register with YouTube's Content ID can choose from three actions when their content is detected:

- **Monetize**: Place advertisements on the video and collect revenue;
- **Track**: Monitor viewership data without monetizing; or
- **Block**: Prevent the video from being viewable in certain regions or entirely.

### Blast Off's Music Catalog for YouTube Creators

23.  Blast Off is an independent music company that operates as a music licensing platform specifically designed for YouTube creators, particularly those making YouTube Shorts (short-form videos).  The company owns approximately 800 music tracks and makes

them freely available through YouTube's public sound library.

24. Blast Off's music catalog was developed through an organic, creator-driven process not unlike scoring films. Blast Off's network of YouTube creators (i.e., users who post videos to YouTube) actively communicated their content needs, audience preferences, and creative requirements—requesting specific emotional tones, tempo ranges, and stylistic elements that would enhance their videos' impact. This collaborative process allowed Blast Off to commission music tailored to demonstrated creator demand, resulting in tracks that achieved rapid adoption and sustained usage. This ecosystem of trust, communication, and iterative refinement took years to build.

25. Blast Off operates a revenue-sharing model with YouTube content creators, providing them access to a library of music tracks that they can use in their videos. Blast Off's revenue model works as follows:

- Any YouTube creator worldwide can select Blast Off's music from YouTube's sound library and include it in their videos;

- When a video containing Blast Off's music is uploaded, YouTube's Content ID system automatically identifies the music;

- YouTube places advertisements on these videos and generates revenue;

- This advertising revenue is split between YouTube (which takes a platform fee) and the music rights holder (Blast Off); then

- Blast Off shares a portion of its revenue with creators who are part of its network.

26. Crucially, Blast Off has no control over who uses its music because it operates as a public library. Any creator can select and use Blast Off's tracks without Blast Off's permission, knowledge, or involvement in the video's creation.

27. Blast Off has recently become a leading provider of music for YouTube creators. By August 2025, Blast Off had built a network of over 20,000 active YouTube

content creators using its catalog. These users sign a Non-Exclusive Content Creator Revenue Share Agreement with Blast Off, which requires them to ████████████████ ██████████████████████████████████████████████████████[6] Blast Off's users include well-known YouTube creators such as ██████████, ██████████, ██████████, ██████, and ██████████████.

28. Blast Off's catalog generates extraordinary engagement on a massive scale. Its music tracks appear in videos that collectively receive over 1 billion views per day on YouTube. By September 2025, Blast Off's revenue had grown to approximately $42,500 per day, with a documented growth rate of 30% in September 2025 alone, the highest monthly growth rate in Blast Off's history. This explosive growth trajectory positioned Blast Off as a significant and rapidly expanding independent operator in the music monetization space.

**Defendants' Representations to Induce Blast Off to Enter the Agreement**

29. Because it does not have the resources to manage the Content ID and YouTube monetization process by itself, Blast Off depends on relationships with larger companies to do so. This structure means that Blast Off does not directly control its content on YouTube. All technical interactions with YouTube's Content ID system—placing claims, releasing claims, blocking content, or removing content from YouTube—goes through Blast Off's monetization partner—most recently, and as relevant to this case, DMC.

30. **Prior to August 2025, Blast Off worked with AdRev, a division of AudioMicro and part of AVL Digital Group Inc.,[7] pursuant to a Program Agreement dated May 15, 2024**

---

[6] A copy of Blast Off's Non-Exclusive Content Creator Revenue Share Agreement is attached hereto as Exhibit 2.

[7] On information and belief, Downtown acquired the AVL Digital Group in or around 2019.

(the "AdRev Agreement") to manage its content on YouTube. Under the AdRev Agreement, AdRev provided YouTube monetization services for Blast Off's sound recording content on YouTube in exchange for a ███████████. Blast Off also worked with AdRev to collect revenues for Blast Off's separate music publishing rights in Brazil and the United States. In or around August 2025, AdRev assigned the AdRev Agreement to DMC. At the time of assignment, AdRev owed Blast Off approximately $814,000 for July royalties and an additional $836,000 for August royalties under the AdRev Agreement revenue share arrangement. These amounts represented revenues earned under the AdRev Agreement's ████████████, under which Blast Off, as the content owner, ████████████████ ████.

31.    At this time, DMC was in advanced negotiations to be acquired by Virgin Music Group (a division of UMG) in a transaction valued at approximately $775 million. The transaction was announced in December 2024 and remains subject to regulatory review by the European Commission, with over 200 independent music industry participants publicly opposing the acquisition due to concerns about major label control over independent distribution infrastructure.

32.    With only months left until the expiration of the AdRev Agreement's initial term, Defendants actively solicited Blast Off to enter into a new agreement. Initially, Downtown expressed interest in entering new agreements to expand the parties' relationship to cover publishing rights globally (not simply in the United States and Brazil). Although Blast Off declined to enter into a new publishing deal, the parties nonetheless proceeded with negotiations concerning the AdRev Agreement (i.e. YouTube monetization for sound recordings). During these discussions, Defendants made numerous material representations to

induce Blast Off to agree to the transaction, including:

**Superior YouTube Relationships**. Defendants represented that they had top-level relationships with YouTube that would ensure smooth operations and that Blast Off would not have to worry about the types of minor compliance issues that inevitably arise in content monetization at massive scale. DMC specifically represented that it had the relationships necessary to manage any YouTube policy issues that might arise and would work collaboratively with Blast Off to resolve them.

**Expertise in Managing YouTube Compliance**. Defendants held themselves out as experts in navigating YouTube's policies and represented that they had sophisticated systems and processes to handle any issues that might arise. Defendants represented they regularly worked with YouTube to resolve compliance matters and had established protocols for addressing content concerns.

**Commitment to the Relationship**. Defendants represented that they were committed to a long-term partnership with Blast Off and would work collaboratively to maximize revenue for both parties. Defendants emphasized that the Agreement's ███████ minimum term reflected their commitment to building a sustainable partnership.

33.   In reliance on these representations and Defendants' promise of a ███████ ███████, on or about August 22, 2025, Blast Off and DMC entered into the Agreement, which superseded and replaced the AdRev Agreement. Defendants' representations described above were material to Blast Off's decision to enter into the Agreement with Defendants rather than pursuing other options or simply allowing the AdRev Agreement to continue on its existing terms.

34.   Notably, Downtown delayed execution of the final Agreement for weeks so

that their counsel in the United Kingdom could review and approve it—demonstrating their sensitivity around ensuring a smooth review and approval process in Europe for their acquisition by UMG.

## Relevant Agreement Terms

35. Under Sections 1 and 3 of the Agreement, Blast Off granted DMC the ███████ right to monetize Blast Off's sound recording content on YouTube and other covered platforms in exchange for DMC's payments of (1) ████████████ ████████████████; (2) ████████████████████████████; and (3) monthly revenue share payments equal to ████████████████ ████████████, and ████ thereafter.

36. DMC will ████████████████ through Blast Off's ████████████. Ex. 1. § 3(a)(vi). Critically, however, the Agreement provides that ████████████ ████████████████████████████████████████████ ████████████████████████████ *Id.*

37. The Agreement has an initial term of ████████ from the Effective Date (i.e., through ████████████), automatically extending until ████████████████. *Id.* § 9.

38. The Agreement also contains specific provisions governing termination and breach. Section 8 provides:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

39. The ████████████ was important to Blast Off. Given the nature of the business, it was foreseeable that minor, curable infractions could arise and that Blast Off

would cure them.

40. Section 9(e) further provides that either party ████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

41. In sum, DMC's responsibilities under the Agreement include:



### The Agreement Economics

42. On August 29, 2025, following execution of the Agreement, DMC ████████
████████████████████ and ████████████████████████ as required.

43. At the time of execution, Blast Off's business was generating substantial and rapidly growing revenues. In July 2025, under the AdRev Agreement, Blast Off generated approximately $904,546 in gross revenue. By August 2025, Blast Off's gross monthly revenue had grown to approximately $929,762. In September 2025, Blast Off's gross revenue exploded to approximately $1,280,928, representing 30% month-over-month growth, the highest growth month in Blast Off's history. This translated to approximately $42,500 in gross revenue per day by September 2025, with clear upward momentum.

44.     At this rate of revenue generation, Blast Off was positioned to earn substantial revenue, and the initial ███████████ would be ███████████████. After full recoupment, Blast Off's share would increase to ████, reducing DMC's share from ███ ████. Downtown would also owe Blast Off another █████████████████ ████████████ after execution of the Agreement, respectively.

### The Parties' Working Relationship and Blast Off's Compliance Efforts

45.     Blast Off operates a network of over 20,000 content creators who use Blast Off's music in their videos. Additionally, Blast Off provides its music catalog as a free public library available to any YouTube creator, even those outside of its creator network. While Blast Off provides music tracks for these creators' use, Blast Off is not involved in, and has no control over or prior approval of, the content of the videos.

46.     Some creators may use Blast Off's music—like music from any public library—in videos that may violate YouTube's policies (such as videos containing copyrighted movie clips or inaudible music). When such videos are uploaded, YouTube's Content ID system automatically detects Blast Off's music and, through DMC, monetizes those videos—without determining whether the underlying video content violates YouTube's policies.

47.     Blast Off's users generate over 1 billion daily views using Blast Off's tracks, which are used in hundreds of thousands of YouTube videos. This use of Blast Off's music at massive scale, both from Blast Off's content creators and other YouTube creators, means that managing compliance is an ongoing challenge requiring sophisticated systems and constant monitoring.

48.     To address the inherent compliance challenges of operating a public music

library at this scale, Blast Off developed and implemented sophisticated AI-powered compliance tools to monitor the use of its music on YouTube. These tools automatically scan channels using Blast Off's music to identify potential policy violations and flag problematic content for removal or claim release. Blast Off implemented daily validation of newly connected channels and monthly audits of all revenue-generating channels.

49. Following execution of the Agreement, Blast Off worked cooperatively with Defendants' employees to ensure compliance with YouTube's policies and to address any issues that arose. Those employees worked primarily at FUGA—a subsidiary of Downtown. FUGA is a music distributor based in The Netherlands.

50. For example, beginning in mid-September 2025, Blast Off proactively communicated with Matt Whitmire (FUGA Vice President of Business Development), Tina Martin (UGC Claims Manager), and Alex Mills (UGC/SVM Manager), regarding various operational matters:

- On September 19, 2025, Blast Off contacted Alex Mills to arrange for manual claiming services[8] on videos from one of Blast Off's top creators, ███████ ██████ who averages over ███████ views per day. Blast Off provided a detailed spreadsheet to track these claims and requested same-day claiming service.

- Between September 19 and September 25, 2025, Blast Off and Downtown employees exchanged multiple emails regarding manual claims for specific videos, demonstrating an ongoing, cooperative working relationship.

- On September 22, 2025, Blast Off even requested that Downtown *release* a claim that had been placed on a video because the video was over one minute long and would affect the creator's monetization—demonstrating Blast Off's proactive

---

[8] A "manual claim" is a feature on YouTube that allows a content owner—such as Blast Off—to put a "claim" on a video featuring its music in order to monetize it, where the video was not otherwise flagged automatically for monetization through the Content ID system. Blast Off relies on Defendants to submit manual claims for videos that contain Blast Off's music but are not automatically monetized.

attention to compliance issues.

- On September 25, 2025, Blast Off again contacted Downtown employees requesting assistance with manual claims, noting, "We've got 60m+ views in there already generated from the past couple days."

51.     Throughout this period, Blast Off demonstrated that it was actively monitoring channels, proactively identifying issues, and working collaboratively with DMC to address compliance matters—exactly the type of good-faith partnership DMC had represented it was committed to supporting.

### The "Warning" From YouTube and Blast Off's Immediate Response

52.     On September 29, 2025, Matt Whitmire sent Blast Off an email stating that DMC had received "an official warning from YouTube Music team that the two tracks below were being used in 'circumvention.'" "Circumvention" refers to YouTube's policy prohibiting content managers from engaging in practices that attempt to go around or interfere with YouTube's systems, processes, or policies.

53.     Out of Blast Off's catalog of approximately 800 tracks that have been used hundreds of thousands of times on YouTube, only *two specific instances* of use were identified in Mr. Whitmire's September 29 email as potentially problematic due to being flagged by YouTube. One of the identified tracks—"Mischief Moves"—has notably been used over 84,000 times by YouTube creators, yet this was the first time YouTube identified its particular usage as potentially violating a policy.

54.     Indeed, Blast Off had worked with AdRev for over a year before the Agreement was executed, and had never had any material issues with YouTube, AdRev, or Downtown (the ultimate parent of AdRev). In fact, on one isolated occasion, a third party uploaded a video containing copyrighted content that also happened to feature a Blast Off song, but Blast Off immediately identified the issue and excluded that video from

monetization.

55.     Significantly, Mr. Whitmire acknowledged uncertainty about what had caused the YouTube warning, speculating that "[t]he only thing I can think is the manual claiming we do might of [sic] triggered this." Mr. Whitmire further surmised that "████████ makes his own videos I don't think his videos are the issue, but we need to hear it from YouTube before we continue with manual claims." Based on this uncertainty, Mr. Whitmire stated that DMC was "halting manual claiming" pending a meeting with YouTube's team.

56.     Notably, Mr. Whitmire's email contained no allegation that Blast Off had done anything wrong. To the contrary, his speculation that the manual claiming process might have triggered the issue suggested the problem arose from DMC's operations, not from any action by Blast Off or its music.

57.     Blast Off responded immediately—within 15 minutes of receiving Mr. Whitmire's email—with a detailed explanation and proactive solutions:

> It's most likely being caused by the influx of 'movie' / unmonetizable channels on blast off that we've having to ban / reject daily. Started coming in end of last week and our team has been on it already. We've rejected 100+ channels that started posting with us over the past few days and we'll need them all white listed and claims released today if possible. The other Korean companies got shut down by YouTube after working with tens of thousands of these types of channels for years, so we saw a ton of them trying to come into blast off and we've been on a banning spree ever since.

> It's frustrating as there's no 'circumvention' happening on our end as it's a public library and anyone can use our music freely without our permission, but we built out an AI flagging system powered by OpenAI over the past week that's going to allow us to catch any channels using our music that shouldn't be monetized, so we can white label channels and release claims.

58.     This response demonstrated that Blast Off (i) immediately took responsibility for identifying potential causes and seeking to address this new and unforeseen issue; (ii) had already identified the potential root cause (influx of problematic channels from other shut-

down Korean companies attempting to use Blast Off's platform); (iii) had already taken substantial remedial action (banning 100+ channels) prior to any notification from DMC; (iv) communicated to DMC that it had developed technical solutions to address this issue going forward (AI-powered flagging system); and (v) was proactively seeking DMC's assistance to implement those solutions.

59.     As it explained to Defendants, Blast Off operates a public music library that anyone can access and use without Blast Off's permission. While there is obvious inherent risk that others will use Blast Off's content in violation of YouTube's policies, Blast Off takes active measures to prevent such violations from occurring to the extent it is able and responds when it identifies a problem, as demonstrated by its response to this emerging issue.

60.     Over the next three days, Blast Off worked intensively to cure any potential issues. On September 29, 2025, Blast Off sent Downtown a spreadsheet identifying specific channels that needed to be white-listed and have claims released, stating: "it's very important we white label [sic] these channels alongside releasing claims so they can't be monetized again." In this context, white-listing means releasing any existing revenue claims on those channels and preventing future monetization of those channels.

61.     On September 30, 2025, less than 48 hours after receiving Downtown's email, Blast Off sent DMC an updated list identifying 660 channels that needed white-labeling and claims released, stating: "We've done a full sweep of all channels that have generated more than $1 in revenue up until September 28th."

62.     On October 1, 2025, Blast Off proactively requested that Downtown remove the track "Cold Case" from the YouTube Shorts library, explaining: "We've been doing a thorough audit and crack down this past week on any usage of our music that could be

deemed 'Circumvention' in YouTube's eyes and we take this very seriously. After scanning our entire catalogue, we noticed many creators are using our track 'Cold Case' and using it where it is barely audible in their shorts. Although we've sent warnings about this before to our network many times, it's time we remove this track from shorts library use to prevent any future trouble." On October 2, 2025, Downtown confirmed that it had deactivated "Cold Case" as Blast Off requested.

63.  Blast Off's response to Downtown's September 29 email demonstrated exactly the type of good-faith, proactive partnership DMC had represented it was committed to supporting: immediate response (within 15 minutes), complete transparency about the issue's cause, substantial remedial action already taken (100+ channels banned), sophisticated technological solutions implemented (AI-powered compliance tools), comprehensive remediation (660 channels identified for white-labeling), proactive prevention (requesting track removal before any issue arose), and full cooperation with DMC's remediation requirements.

64.  Throughout this period, there was no indication from Downtown that Blast Off's response was inadequate, that further action was required, or that DMC was contemplating termination. To the contrary, Downtown continued to implement Blast Off's requested remedial actions, including deactivating the "Cold Case" track on October 2, 2025.

65.  At no point during this period did DMC provide Blast Off with written notice specifying in reasonable detail the nature of any alleged breach or a ████████████ (as required by Section 8 of the Agreement). Nor did DMC give any indication that it considered Blast Off to be in material breach of the Agreement or any explanation of how two discrete instances of potential misuse of Blast Off's catalog (amounting to only 0.001% of all uses)

allegedly constituted a "material" breach.

**Defendants' Pretextual Termination and Bad Faith Conduct**

66.     On October 2, 2025, the same day DMC confirmed it had deactivated the "Cold Case" track per Blast Off's request, DMC suddenly sent Blast Off a letter (the "Termination Letter") purporting to terminate the Agreement *immediately*.

67.     The timing of this termination was striking.  Just 34 days into a ▆▆▆▆▆ ▆▆▆▆▆ term, and just three days after first raising any compliance concern with Blast Off (which concern was immediately addressed well within 72 hours), DMC elected to destroy the entire relationship without even paying lip service to the ▆▆▆▆▆▆▆▆▆▆ expressly required by the Agreement.

68.     The Termination Letter asserted that Blast Off had committed a "material breach" of the Agreement by "intentionally circumventing and violating YouTube's monetization policies and terms." This allegation was false.  Blast Off had not "intentionally" done anything.  The issues arose from third-party creators' unauthorized use of Blast Off's public music library—use that Blast Off cannot control but that Blast Off had expeditiously addressed.

69.     As supposed evidence, the Termination Letter cited only *two* examples of allegedly problematic videos:

- Ranking Rocks and Logs Thrown into Water – claiming the track "Cold Case"; and

- Theo Von Plays Guess Who with Pete Davidson – claiming the track "Mischief Moves."

70.     Neither of these videos was created by Blast Off, uploaded by Blast Off, or authorized by Blast Off.  Both were created by third-party YouTube users who selected Blast Off's music from YouTube's public sound library—a library available to any creator

worldwide. Blast Off had no involvement in, knowledge of, or control over the creation or upload of these videos, and certainly no intent to violate any policy through their posting.

71.     The Termination Letter was defective for multiple reasons. *First*, it failed to provide the ███████████ required by Section 8 of the Agreement. Section 8 requires ████████████████████████████████████████████████████████ The Termination Letter provided only two examples of third-party videos, made no allegation that Blast Off itself had done anything wrong, and failed to specify what actions Blast Off allegedly should have taken or could take to remedy the supposed breach. In short, it failed to identify the nature of any breach.

72.     *Second*, the Termination Letter failed to provide Blast Off with the ███████ ███████ required by Section 8 of the Agreement. Rather, it inexplicably stated that the alleged breach was "not capable of being cured" without any factual support, and in direct contradiction of Blast Off's demonstrable curing of the issues Defendants raised only three days prior, including:

- Identification and banning of 100+ problematic channels;

- Development of AI-powered compliance tools;

- Proactive removal of the "Cold Case" track from the Shorts library;

- Provision of detailed spreadsheets identifying 660 channels requiring remediation;

- Immediate responses to DMC's concerns; and

- Full cure of any alleged breaches within 48 hours.

73.     *Third*, it failed to establish materiality. The Termination Letter identified issues with the use of only 2 tracks out of approximately 800 (0.25% of the catalog). And it provided no evidence of any actual damages suffered by DMC or explanation of how two instances out of over a hundred thousand uses of content could constitute a "material" breach

of an agreement premised on monetizing Blast Off's entire catalog.

74.     The Termination Letter demanded that Blast Off immediately return the ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and stated that DMC would hold Blast Off's revenue share for August and September hostage "pending a resolution of this matter." It further stated that "DMC will seek redress and return from Blast Off of all revenues previously paid through to Blast Off in excess of such held revenues."

75.     In total, Defendants demanded return of millions of dollars from Blast Off while simultaneously terminating the Agreement in violation of its express terms, freezing all revenue payments owed to Blast Off under both the Agreement and the predecessor AdRev Agreement, providing no accounting of revenues collected or owed, and offering no basis for retaining revenues earned by Blast Off's catalog.

76.     The purported reasons for termination set forth in the Termination Letter are pretextual. The evidence demonstrates that DMC's true motivations for terminating the Agreement were financial and strategic, not based on any legitimate compliance concerns.

77.     ***The Economic Motivation.*** September 2025 represented a critical inflection point for Blast Off's business. Blast Off achieved 30% month-over-month growth, the highest in its history. Daily revenue reached approximately $42,500 per day by September 2025. The business had achieved clear momentum with over 1 billion daily views. The 20,000+ creator network was generating compounding growth effects and management projections showed continued substantial growth.

78.     This meant the Agreement was going to become increasingly complex for Defendants to manage—with growing numbers of claims to make, content to manage, revenue to track and remit, etc. At the same time, DMC's revenue share would drop from

██████████ by January 2026 at the September revenue rate. Rather than honor their bargain, Defendants seized upon minor, foreseeable compliance issues as a pretext to escape a contract that was becoming increasingly burdensome and decreasingly profitable. In other words, Defendants would not make as much money under the Agreement as they had thought based on projected margins due to explosive growth. Rather than attempt to renegotiate, they opted to unilaterally terminate.

79. *The UMG Acquisition Context.* On information and belief, DMC's decision to terminate was also influenced by its parent company's pending $775 million acquisition by Virgin Music Group (a division of UMG). The acquisition is under Phase II investigation by the European Commission. Over 200 industry participants have publicly opposed the acquisition due to concerns about major label control over independent distribution infrastructure.[9] In other words, Downtown was under scrutiny during the exact period of the termination.

80. On information and belief, maintaining continuous and unchallenged CMS access and compliance optics was important to securing regulatory approval. Any issues with its key platform partner YouTube—whether legitimate or not—could negatively impact the acquisition. Downtown preemptively chose to sacrifice Blast Off's rights rather than work through routine compliance matters out of an abundance of caution to protect its larger financial interests during a sensitive period.

81. Against this backdrop, Defendants had every incentive to eliminate any problems with YouTube during the sensitive acquisition review period, even if it meant

---

[9] *See* https://www.digitalmusicnews.com/2025/07/07/downtown-music-universal-investigation-calls/.

wrongfully terminating a contract with an independent operator who lacked the resources to fight back effectively. While the minor compliance issues that arose represented exactly the type of foreseeable hiccup that Defendants had represented they were equipped to handle, when faced with even minimal friction with YouTube, Defendants chose the path of least resistance: terminate the contract and blame Blast Off.

82. *The Timing Betrays the Motive.* Indeed, the timing of Defendant's purported termination betrays their bad faith. They terminated after only ***34 days*** of performance (out of a ▮▮▮▮▮ term), immediately after (1) the first compliance issue arose, and (2) seeing September's growth explosion.

83. *The Disproportionate Response.* Even if DMC's allegations were true (which they are not), DMC's response was absurdly disproportionate. The alleged problem was based on merely two instances of use of two tracks out of an 800-track catalog used in hundreds of thousands of videos. DMC's response was to destroy hundreds of millions of dollars in catalog value and terminate a ▮▮▮▮▮ agreement after 34 days. No rational business would destroy a partnership of this value under these circumstances unless the true motive was to escape the contract for unrelated reasons.

### Subsequent Events Further Evidence Defendants' Bad Faith

84. On October 7, 2025, Blast Off's counsel sent Defendants a detailed response letter (the "Response Letter") explaining the deficiencies in Defendants' Termination Letter and Defendants' own breaches of the Agreement. The Response Letter pointed out that DMC had failed to provide the required ▮▮▮▮▮▮▮▮, had failed to establish materiality, had ignored Blast Off's comprehensive remediation efforts, and had acted in bad faith.

85. Defendants responded to the Response Letter in a letter dated October 22, 2025

(the "October 22 Letter")—sent nearly ***three weeks*** after the Termination Letter. The October 22 Letter alleged new—and equally baseless—grounds for termination, including that (1) 98% of Blast Off's "top assets" are purportedly circumventing or attempting to circumvent YouTube policies, and (2) "upwards of 40% of Blast Off's total revenue was directly derived from these policy-violating activities." This is preposterous. All of Blast Off's songs abide by YouTube's Content ID system policies, are proprietary to Blast Off, and are available for free use to the public. They can be argued to "circumvent" YouTube's policies no more than *every song* available for use on YouTube can be. Indeed, the only evidence of "circumvention" cited by Downtown was, again, specific instances of use by third parties.

86.    The October 22 Letter concludes that "it has become apparent that Blast Off's entire business model relies on the improper circumvention of YouTube's policies." Tellingly, if Defendants truly objected to Blast Off's business model, all the data they cited as a breach existed before the Agreement was executed, and certainly as of October 2 when they purported to terminate. These new rationales show that Defendants—realizing they had cited no legitimate grounds to terminate—went on a hunt after-the-fact to find additional pretexts to support their bad faith termination.

87.    And even these new excuses fall flat. Despite claiming, for example, that Blast Off is "intentionally" circumventing YouTube policies, the October 22 Letter cites only conduct by *third parties*. As Defendants know, Blast Off does not create the videos or enable circumvention in any manner, and cannot prevent third parties from using publicly available music.

## Continuing Harm

88.    To date, Defendants have not withdrawn their termination, have not released

the frozen royalties, and have not withdrawn their demand for return of the ▋▋▋▋▋
▋▋▋▋.

89.     Defendants are also improperly withholding July and August 2025 revenues that were earned under the prior AdRev Agreement.  These revenues, estimated at $1.65 million, were earned before the Agreement was even executed on August 22, 2025, and before the ▋▋▋▋▋▋ was paid on August 29, 2025.  Under the AdRev Agreement's ▋▋▋ ▋▋▋▋▋, Blast Off was entitled to ▋▋ of these revenues to be paid within ▋▋▋. Defendants are now improperly applying these pre-Agreement revenues to recoupment of the DMC advance, despite having no credible basis for doing so.  This constitutes conversion of Blast Off's funds.

90.     Defendants' bad faith conduct does not stop there.  After purporting to terminate the Agreement, Defendants have taken calculated actions designed to destroy Blast Off's business and prevent Blast Off from working with any competitors.  **First**, Defendants have refused to maintain Content ID claims on Blast Off's content, resulting in competing claims by third parties and loss of revenue to Blast Off.  By abandoning Blast Off's content while continuing to control it through the Content ID system, Defendants have created a situation where Blast Off cannot earn revenue from its own catalog and cannot effectively transfer that catalog to an alternative partner.

91.     **Second**, and most egregiously, Defendants intentionally **delisted** Blast Off's **entire music catalog** from YouTube.  This means no song in the catalog be used on YouTube until they are re-listed.  This action has devastating and permanent consequences.

92.     *The Technical Effect*:  Once songs are delisted from YouTube's system by one monetization partner, they generally cannot be re-listed by another partner without YouTube's

manual review and re-approval—an uncertain, time-consuming, and potentially unsuccessful process. And, even if the songs could be relisted by another partner without manual review, new partners are generally unwilling to do so in light of the "poisoning effect" discussed below.

93.     *The "Catalog Poisoning" Effect:*  In the music licensing industry, sudden and complete catalog removal carries a recognized reputational stigma referred to as "catalog poisoning."  Once a catalog has been removed by a CMS partner, industry participants commonly presume that the underlying rights, ownership chain, or compliance record is defective.  This stigma persists regardless of the true cause of removal and has the effect of dramatically depressing both licensing demand and long-term asset value.

94.     *The Permanent Stigma*:  Even if Blast Off eventually secures alternative distribution, the stigma created by DMC's actions will permanently impair the catalog's value.  The music industry will forever view this catalog as having been "rejected" by YouTube, creating a permanent discount in any future transaction and ongoing difficulty in securing partnerships.

95.     The harm to Blast Off's business is catastrophic and multifaceted.

96.     Blast Off immediately lost approximately $42,500 per day in gross revenue for sound recordings under the Agreement when DMC ceased monetization.  At Blast Off's ███ ██████████████████████████████████████████████████████████████ ████████████████████████████████ at September 2025's run rate, not accounting for the destroyed growth trajectory.  And with this catalog now unavailable on YouTube, Blast Off is also losing additional daily revenues from its publishing rights royalties.  Based on past performance, Blast Off estimates its total daily losses, including from publishing, to be at least

$56,000.

97.     September 2025's 30% month-over-month growth represented an inflection point into exponential growth.  Music catalogs monetized on YouTube Shorts scale through network-effect adoption patterns, where creator usage drives algorithmic promotion, which in turn drives further usage.  Once that compounding curve is disrupted, it cannot be re-created.  Blast Off's business was achieving critical mass with its 20,000+ creator network, creating compounding network effects.  The termination destroyed all momentum at precisely the moment when the business was entering a period of accelerated growth.  The lost opportunity value of this destroyed growth trajectory is substantial.

98.     Defendants' conduct also destroyed Blast Off's platform brand and business with an independent value of $75-100 million.  Blast Off had spent over five years and millions of dollars cultivating its 20,000+ network of YouTube creators.  When they all suddenly lost access to Blast Off's catalog, they immediately began migrating to competitors.  Blast Off's market share has been irreparably eroded.

99.     The catalog poisoning also has created unprecedented harm to Blast Off's reputation in the music industry.  Blast Off values its 800-track catalog at $250 million based on industry-standard revenue multiples applied to documented revenue streams. The catalog poisoning caused by Downtown's actions has rendered this asset effectively unmarketable in its intended sphere.

100.    For example, Blast Off contacted 24 potential partners on October 4, 2025. When those potential partners learned that Blast Off's catalog had been removed by Defendants, they refused to work with Blast Off on the de-listed tracks. ▄▄▄▄▄ conveyed its assumption, for instance, that there must be copyright issues with Blast Off's tracks

because Defendants had delisted it, while ███████ relayed its reluctance to proceed in order to protect its current clients.

101.    And because it cannot easily re-list the 800 tracks without Downtown's involvement, Blast Off has been forced to commission new music to continue operating. Producing new tracks requires commissioning composition and production work, mixing and mastering, metadata preparation, ingestion for distribution, and testing for suitability and performance in short-form video environments.

102.    However, creating new tracks does not and cannot replace the commercial value of the original catalog, which had already achieved large-scale platform adoption, algorithmic trust, and predictable revenue performance based on billions of verified views. The network effects that drove the original catalog's success—YouTube creators discovering tracks through other creators' usage, algorithmic promotion based on engagement patterns, and viral adoption within creator communities—cannot be replicated quickly or through increased production spending alone.

103.    Finally, Blast Off is entitled to royalties from Performing Rights Organizations such as ASCAP, BMI, SESAC, and international societies for public performances of its musical compositions. These royalties require an infrastructure for proper tracking and collection. Defendants' termination has blocked collection of these royalties, which are estimated at $5 million annually.

104.    Based on its investigation to date, Blast Off conservatively estimates total current damages to be upwards of approximately $375 million. These damages are well-supported by platform-verified revenue data, industry-standard valuation methodologies, and documented business harm.

105.    Defendants' conduct demonstrates a calculated strategy to destroy Blast Off's

business rather than perform in good faith under the Agreement's express terms, and is

inconsistent with the parties' intentions when they entered the Agreement. By terminating

without providing the required ██████████████, refusing to account for or pay revenues

owed, de-listing Blast Off's entire catalog and poisoning its industry reputation, converting

pre-Agreement revenues to ██████████████, demanding return of the advance while

retaining all revenues, and abandoning Blast Off's content to third-party infringement,

Defendants have ensured that Blast Off cannot effectively operate its business, work with

competitors, or generate revenue from its own catalog. Blast Off faces permanent impairment

of its core assets—all while Defendants improperly demand return of the ██████████████,

retain the revenues collected since termination, and convert the pre-Agreement revenues.

106.    Defendants' permanent destruction of Blast Off's music library's value on

YouTube represents an intentional act to sabotage Blast Off's business and prevent Blast Off

from working with any competitor of Defendants. This scorched-earth tactic reveals

Defendants' true character: they are willing to destroy an independent operator's entire

business rather than honor a contract that became economically unfavorable to them. The

minor compliance issues were seized upon as a pretext for escaping an agreement and

partnership the Defendants no longer wanted to honor.

107.    Blast Off is informed and believes, and on that basis alleges, that Defendants'

conduct was willful, intentional, and designed to eliminate Blast Off as a regulatory

complication during DMC's parent company's $775 million acquisition, misappropriate Blast

Off's revenues and retain ██████████████, destroy Blast Off's business to prevent it from

partnering with Downtown's competitors, and exploit the power imbalance between a major

industry player and an independent operator.

108.  This case exemplifies precisely the type of conduct that opponents of the UMG/Downtown acquisition warned about: a major-label-owned entity destroying an independent operator's business when it became inconvenient, using pretextual compliance concerns as cover for bad faith economic motivations. Blast Off will not allow Defendants' conduct to go unchallenged.

## FIRST CLAIM FOR RELIEF
### (Fraudulent Inducement)

109.  Blast Off incorporates by reference as if fully set forth herein all facts and allegations set forth above.

110.  In or around August 2025, Defendants induced Blast Off to enter into the Agreement by representing that:

- Defendants had top-level relationships with YouTube that would ensure smooth operations;

- Defendants had sophisticated systems and expertise to handle any compliance issues that might arise;

- Plaintiff would not have to worry about the types of minor compliance hiccups that inevitably occur at scale;

- Defendants would work cooperatively with Plaintiff to address any issues; and

- Defendants were committed to a long-term partnership with Plaintiff.

111.   Blast Off reasonably relied on these representations, which were material to Blast Off's decision to enter into the Agreement.[10]

112.   In fact, these representations were false when made, or Defendants had no intention of honoring them or made them recklessly without regard for whether they could or would honor them.  The obvious falsity of the statements is demonstrated by the speed with which they terminated the Agreement (barely one month after execution, and immediately upon identification of a single issue), and the pretextual nature of the alleged breaches (citing only 2 tracks out of 800 as problematic).

113.   Had Blast Off known these misrepresentations were untrue, it would never have entered the Agreement.

114.   As a direct and proximate result of Defendants' fraudulent inducement, Blast Off has suffered substantial damages in an amount to be proved at trial, including but not limited to:

- The benefit of the bargain (the value of the Agreement had it been performed for its full term);

- Out-of-pocket losses (including the ███████████ that Defendants are wrongfully demanding be returned, expenses incurred in reliance on the Agreement, and costs of compliance systems);

- Loss of earned royalties being wrongfully withheld;

- Permanent destruction of Blast Off's music library value on YouTube through delisting; and

- Other consequential damages.

---

[10]   The merger clause found in Section 15 of the Agreement does not undermine Blast Off's reasonable reliance on these representations under New York law because it is only a general merger clause. *Laduzinski v. Alvarez & Marsal Taxand LLC*, 132 A.D.3d 164, 169 (1st Dep't 2015).

115.    Defendants' conduct was also willful, wanton, and done in reckless disregard of Blast Off's rights, justifying an award of punitive damages. Defendants knowingly made false representations to induce Blast Off into an exclusive relationship, then deliberately destroyed Blast Off's ability to work with anyone else when the relationship no longer served Defendants' interests.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

116.    Blast Off incorporates by reference as if fully set forth herein all facts and allegations set forth above.

117.    The Agreement was entered on or about August 22, 2025 and is a valid and enforceable contract.

118.    Blast Off has performed all of its duties and obligations under the Agreement, except to the extent excused by the conduct of Defendants.

119.    DMC breached its obligations under the Agreement in many ways, including at least the following:

120.    **Failure to Maintain Content ID Claims (Section 2)**: Section 2(a) of the Agreement confers on DMC the right—and core obligation—to serve as Blast Off's ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Blast Off's content. Defendants have failed to maintain Content ID claims on Blast Off's content properly, resulting in, among other things, competing claims by third parties, in breach of Section 2(a).

121.    **Failure to Pay Earned Royalties (Section 3)**: Section 3(b) of the Agreement requires Defendants pay Blast Off its earned royalties on a monthly basis and within ▆▆▆▆

after the close of each calendar month. Yet Defendants have failed to pay Blast Off its earned royalties for July, August, September, and October 2025, in violation of Section 3(b) of the Agreement. Based on verified platform data showing approximately $814,000 net revenue in July 2025 alone, and with September showing $1,280,928.31 gross revenue (30% growth), Defendants owe Plaintiff approximately $3 million in unpaid royalties.

122. **Improper Withholding of Pay-Through Revenue (Section 3)**: Section 3 of the Agreement further requires Defendants to ███████████████████████████ ██████████████████████████████████████████. This provision was a material inducement for Plaintiff to enter the Agreement, providing guaranteed cash flow. Defendants' withholding of these amounts breaches the express terms of Section 3(a)(vi).

123. **Improper Withholding of Revenues (Section 6)**: Section 6 of the Agreement allows Defendants to withhold revenues only ██████████████████████████ ███████████. First, Defendants have provided no accounting showing how the withheld amounts relate to any specific claim. And even assuming YouTube's warning about the two usages of two videos were a claim for which Defendants must indemnify Blast Off, Defendants' blanket freeze of all revenues exceeds any amount ████████████ to two allegedly problematic videos.

124. **Wrongful Termination Without Proper Notice and Cure Period (Section 8)**: Section 8 is a condition precedent to termination, requiring ████████████ ██████████████████████████████████████████ ████████████. Defendants purported to terminate the Agreement immediately on October 2, 2025, without providing Blast Off with written notice specifying in reasonable detail the nature of the alleged breaches and without ████████████

██████. Defendants' failure to comply with Section 8 is an independent breach and also renders the termination ineffective.

125.   **Breach of Materiality Requirement (Section 9(e))**:  Even if proper notice had been given, Section 9(e) specifies that the parties can terminate the Agreement ██████ ████████████████████████████  Yet Defendants purported to terminate based on alleged issues with only two videos—out of hundreds of thousands of videos using Blast Off's 800 tracks—identified by YouTube as problematic.  Defendants cannot seriously contend that this issue substantially impaired the contract or was otherwise material.

126.   **Failure to Maintain Services Through Termination (Section 9(f))**:  Even assuming the termination were valid (which Plaintiff disputes), Section 9(f) requires that upon termination, Defendants ████████████████████████████ ████████████████  Defendants have failed to remit earned royalties or provide a final accounting.

127.   Blast Off has suffered substantial damages as a direct and proximate result of Defendants' breaches of the Agreement in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

128.   Blast Off incorporates by reference as if fully set forth herein all facts and allegations set forth above.

129.   Section 15 of the Agreement provides that the ████████████████ ████████████████████████████ ████████████████████████████ ██████████

130.   Implied in all contracts governed by New York law is a covenant of good faith

and fair dealing. The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

131. Defendants breached the implied covenant of good faith and fair dealing in multiple ways, including by:

- Manufacturing pretextual grounds for termination based on only two tracks used in two videos;

- Ignoring Blast Off's extensive, proactive compliance efforts including development of AI-powered flagging systems and identification of 660 problematic channels;

- Withholding earned royalties totaling $3 million without valid justification, including for amounts earned under a different contract;

- Demanding return of the ███████████████████ despite Blast Off's full performance and Defendants' own breaches;

- Allowing competing claims on Blast Off's content;

- Permanently delisting Blast Off's songs from YouTube Shorts library, destroying catalog value and making it impossible for Blast Off to work with alternative partners; and

- Prioritizing their relationship with YouTube and their pending $775 million acquisition over contractual obligations to Blast Off.

132. Defendants acted in bad faith and in an unreasonable manner, with the intent of preventing Blast Off from receiving the fruits of its bargain under the Agreement while destroying Blast Off's ability to work with any of Defendants' competitors. Defendants' misconduct was in all instances either grossly negligent or intentional and had the effect of denying Blast Off the benefits under the Agreement, which thereby breached the implied covenant of good faith and fair dealing implied in the Agreement.

133. Blast Off has suffered substantial damages as a direct and proximate result of Defendants' conduct in an amount to be determined at trial, including for Defendants'

destruction of Blast Off's catalog on YouTube and platform business.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

134. Blast Off incorporates by reference as if fully set forth herein all facts and allegations set forth above.

135. Blast Off pleads this claim in the alternative to its breach of contract claim.

136. Blast Off conferred substantial benefits on Defendants, including the exclusive right to monetize Blast Off's extraordinarily valuable content catalog, and revenues exceeding $800,000 per month.

137. Defendants have been enriched by these benefits, collecting and retaining revenues generated by Blast Off's content.

138. Defendants' enrichment is unjust because:

- Defendants are improperly withholding revenues earned under the prior AdRev Agreement;

- Defendants wrongfully terminated the Agreement and refused to pay Blast Off its earned royalties;

- Defendants are demanding return of previously-paid royalties without any valid basis, as well as the ███████████

139. Under principles of equity and good conscience, Defendants should be required to disgorge all benefits unjustly retained and pay Blast Off the value of the benefits conferred.

140. Blast Off has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### (Conversion)

141. Blast Off incorporates by reference as if fully set forth herein all facts and allegations set forth above.

142. Blast Off has a property interest in royalty payments earned from the

monetization of its content for at least July, August, September, and October 2025.

143. Defendants have intentionally exercised unauthorized dominion and control over Blast Off's property by: (1) collecting revenues generated by Blast Off's content but refusing to pay Blast Off its share (including for amounts earned under the prior AdRev Agreement); and (2) de-listing Blast Off's songs from YouTube Shorts library, which effectively can be undone only by Defendants.

144. Defendants' exercise of control over Blast Off's property is unauthorized, willful, and intentional.

145. As a direct and proximate result of Defendants' conversion, Blast Off has suffered substantial damages in an amount to be proven at trial. Further, Defendants' conduct was willful, wanton, and in reckless disregard of Blast Off's rights, justifying an award of punitive damages.

## SIXTH CLAIM FOR RELIEF
### (Tortious Interference With Business Relations)

146. Blast Off incorporates by reference as if fully set forth herein all facts and allegations set forth above.

147. Blast Off has ongoing business relationships with thousands of content creators who use tracks from its music library in their videos. These creators sign an agreement with Blast Off to participate in Blast Off's revenue sharing model. Some of the more well-known users of Blast Off's music include ████████, ████████, ████████, ████████, and ████, ████.

148. Defendants were aware of these business relationships and of their importance to Blast Off's business model. The entire purpose of the Agreement was to facilitate monetization of Blast Off's music through these creators' YouTube videos.

149. Defendants intentionally interfered with these business relationships by delisting Blast Off's entire catalog from the YouTube Shorts library, making it impossible for creators to continue using Blast Off's music. This has destroyed Blast Off's value proposition to its YouTube users, forcing them to go to competitors to share in monetization of music they incorporate in their videos.

150. Defendants acted with the improper purpose of destroying Blast Off's business to prevent Blast Off from working with competing monetization services and to eliminate any potential business threat from Blast Off.

151. As a direct and proximate result of Defendants' tortious interference, Blast Off has lost and continues to lose valuable business relationships with creators, suffering damages in an amount to be proven at trial for harm including lost revenue, lost business opportunities, and destruction of goodwill.

152. Defendants' conduct was willful, wanton, and in reckless disregard of Blast Off's rights, justifying an award of punitive damages.

## SEVENTH CLAIM FOR RELIEF
### (Injunctive Relief)

153. Blast Off incorporates by reference as if fully set forth herein all facts and allegations set forth above.

154. Defendants are improperly withholding revenues belonging to Blast Off, have de-listed Blast Off's entire music catalog from the YouTube Shorts library, and are allowing competing claims to be placed on Blast Off's content.

155. Blast Off will suffer irreparable harm if Defendants are not enjoined from the aforementioned acts. With every day that passes with Blast Off's catalog de-listed, the harm to Blast Off increases from being unable to monetize its content on YouTube and its users

moving to competing music companies.

156.    Remedies at law are inadequate to fully address the continuing the harm that continues to occur to Blast Off as a result of Defendants' actions.

157.    Blast Off is attempting to do nothing more than prevent Defendants from continuing to harm Blast Off. The balancing of the equities substantially favors Blast Off.

158.    The public has a strong interest in the enforcement of contractual obligations. Moreover, independent music companies like Blast Off have a strong interest in preventing harm from bigger companies, such as preventing Downtown from taking advantage of them. The public interest will be served by an injunction.

159.    Blast Off is entitled to an injunction enjoining Defendants from improperly withholding Blast Off's earned revenue and allowing competing claims to be placed on Blast Off's content. Blast Off is also entitled to an injunction requiring Defendants to re-list Blast Off's catalog on the YouTube Shorts library.

## EIGHTH CLAIM FOR RELIEF
### (Declaratory Relief)

160.    Blast Off incorporates by reference as if fully set forth herein all facts and allegations set forth above.

161.    There is a present and justiciable dispute regarding the parties rights and obligations under the Agreement.

162.    The interests of Blast Off, on the one hand, and Defendants, on the other, are real and adverse.

163.    The dispute between the parties is ripe for judicial disposition given that Blast Off and Defendants disagree regarding whether Defendants breached the Agreement and whether DMC's purported October 2, 2025 termination was valid.

164. Based on the foregoing, absent court intervention, Defendants will operate as if DMC terminated the Agreement on October 2, 2025 even though it had no right to do so. Accordingly, Blast Off seeks a declaratory judgment that DMC's October 2, 2025 notice of termination was invalid and has no effect. Alternatively, Blast Off seeks a declaratory judgment that, if the Agreement is terminated, Defendants must immediately pay all earned royalties through the termination date and may not demand return of ███████████.

### Prayer for Relief

WHEREFORE, Blast Off respectfully requests judgment as follows:

1. That judgment be entered in favor of Blast Off against Defendants;

2. For damages in an amount to be proven at trial;

3. For enforcement of the Agreement and payment of all sums owed to Blast Off in connection with the Agreement;

4. That Blast Off be awarded pre- and post-judgment interest;

5. That Blast Off be awarded its costs and expenses in connection with this action, including attorneys' fees and expenses;

6. That Blast Off be awarded punitive damages on all claims for which such damages are available;

7. That the Court order Defendants to make restitution to Blast Off of their ill-gotten gains;

8. A judicial declaration that (1) DMC's October 2, 2025 notice of termination was invalid and has no effect, or, alternatively, that (2) if the Agreement is terminated, Defendants must immediately pay all earned royalties through the termination date and may not demand return ███████████;

9. That an injunction issue ordering Defendants to re-list Blast Off's music tracks on the YouTube Shorts library, remit to Blast Off the revenues Defendants are improperly withholding, and cease allowing competing claims to be placed on Blast Off's content; and

10. That the Court award Blast Off such other and further relief as may be just and proper.

## **Jury Demand**

Pursuant to Federal Rule of Civil Procedure 38(b), Blast Off hereby demands trial by jury of all issues properly triable thereby.

Dated: New York, New York
November 4, 2025

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP

By:  _____

J. Kernisan
Sara Clark (*pro hac vice* forthcoming)
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
jpkernisan@quinnemanuel.com
saraclark@quinnemanuel.com

*Attorneys for Plaintiff Blast Off Media Inc.*

# EXHIBIT 1

*(filed under seal)*

# EXHIBIT 2

*(filed under seal)*