UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLAST OFF MEDIA INC., Plaintiff, -v- DOWNTOWN MUSIC CAPITAL, LLC *et al.*, Defendants. | 25 Civ. 9363 (PAE) OPINION & ORDER |

PAUL A. ENGELMAYER, District Judge:

This dispute arises from a contract related to a YouTube music catalog. In August 2025, Blast Off Media, Inc. ("Blast Off"), a music licensing platform that makes musical tracks for content creators to use in their YouTube videos, entered an agreement (the "Agreement") with defendants Downtown Music Capital, LLC ("DMC"), Downtown Music LLC, and Downtown Music Holdings LLC (collectively, "Downtown"). Downtown agreed, in exchange for exclusive distribution rights to Blast Off's music catalog, to manage the catalog's monetization, which is the process by which Blast Off earns revenue when its tracks are used in videos.

Blast Off alleges that, in October 2025, less than two months after the parties entered the Agreement, Downtown sent Blast Off a letter purporting to terminate it. Blast Off alleges that Downtown then ceased performing its monetization obligations, withheld Blast Off's revenues and royalties, and delisted Blast Off's music catalog from YouTube. Its Second Amended Complaint ("SAC"), Dkt. 29, brings claims against Downtown for: (1) fraudulent inducement; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) unjust enrichment; (5) conversion; (6) tortious interference with business relations; (7) injunctive relief; and (8) declaratory relief.

Currently before the Court is Downtown's motion to dismiss the SAC in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court denies the motion to dismiss with respect to the SAC's breach of contract and implied covenant claims. It grants the motion with respect to all other claims.

## I. Background[1]

### A. The Parties

Blast Off is a Canadian corporation with its principal place of business in Canada. SAC ¶ 18.

DMC is a Delaware limited liability company with its principal place of business in New York. *Id.* ¶ 19. It is a subsidiary of its sole member, Downtown Music Holdings LLC. *Id.*

Downtown Music LLC is a Delaware limited liability company with its principal place of business in New York. *Id.* ¶ 20. Its sole member is Downtown Music Publishing LLC, whose sole member is Downtown Music Holdings LLC. *Id.*

Downtown Music Holdings LLC is a Delaware limited liability company that is the "ultimate parent company" of all the Downtown entities. *Id.* ¶ 21.[2]

---

[1] The following facts are drawn primarily from the SAC. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For purposes of resolving the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the SAC as true, drawing all reasonable inferences in Blast Off's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] The SAC is inconsistent in referring to DMC and/or Downtown in its allegations. For convenience, the Court refers only to Downtown—a shorthand that encompasses all relevant entities—throughout this Opinion.

### B. Blast Off's Business

Blast Off is an independent music company that operates as a music licensing platform for YouTube creators making short-form videos. *Id.* ¶ 25. It owns a catalog of approximately 800 music tracks, which it makes freely available through YouTube's public sound library. *Id.* Blast Off works closely with a network of "creators" (people who post content on YouTube), commissioning music tailored to their needs. *Id.* ¶ 26.

Blast Off's revenue sharing model works as follows. Blast Off provides creators access to a library of music tracks that they can use in their videos. *Id.* ¶ 27. When a creator uploads a video containing Blast Off's music, YouTube automatically identifies the music as owned by Blast Off. *Id.* YouTube does so through its content management system known as "Content ID," which automatically scans a video when it is uploaded by a creator and compares it against a database of registered audio and video files. *Id.* ¶ 23. When Blast Off's content is detected, Content ID gives Blast Off the option to: (1) place advertisements on the video and collect revenue; (2) track viewership without monetizing; or (3) block the video from being viewable in certain regions or entirely. *Id.* ¶ 24. The revenue from advertisements is split between YouTube and Blast Off; Blast Off shares a portion of its revenue with creators who are part of its network. *Id.* ¶ 27.

By August 2025, more than 20,000 creators were using Blast Off's catalog, including well-known creators such as Law By Mike, Sambucha, Andy Jiang, Mappelz, and Luke Davidson. *Id.* ¶ 29. Blast Off's tracks have been used in hundreds of thousands of YouTube videos, which generate more than one billion daily views. *Id.* ¶ 56.

### C. Blast Off and Downtown's Pre-Agreement Discussions

Because Blast Off lacks the resources to manage Content ID and the monetization process, it partners with larger companies that handle technical interactions with Content ID. Such include placing and releasing claims, blocking content, or removing content from YouTube. *Id.* ¶ 32.

On May 15, 2024, Blast Off entered a monetization agreement (the "Adrev agreement") with Adrev, a subsidiary of Downtown, under which Adrev received a 10% share of Blast Off's gross revenues, and Blast Off retained a 90% share. *Id.* ¶¶ 33, 58.

In early 2025, Downtown solicited Blast Off to enter a new monetization agreement. *Id.* ¶ 34. The SAC alleges the following as to pre-Agreement discussions between Blast Off and Downtown.

On January 9, 2025, Blast Off participated in a video conference meeting with Downtown, which was represented by Matt Whitmire (vice president of business development), Andrew Korn (then senior vice president of operations), and Brett Heatley (vice president of systems development). *Id.* ¶ 36. Korn stated that: Downtown and YouTube had a "strong, longstanding partnership"; Downtown's content management systems had "top tier status" with YouTube; Downtown "expended significant time, effort, and resources" to maintain those systems; and Downtown had successfully resolved Content ID issues in the past. *Id.* Whitmire offered to assist Blast Off in navigating issues with YouTube that might arise, and Korn confirmed that offer of assistance. *Id.*

On February 6, 2025, Blast Off participated in another video conference with Downtown, which was represented by Whitmire, Korn, Christiaan Kröner (president), and Sarah Landy (senior vice president). *Id.* ¶ 37. The parties discussed Blast Off's business model, including its

revenue sharing agreement with creators. *Id.* Kröner congratulated Blast Off on its growth and success and expressed interest in helping Blast Off grow further. *Id.* Downtown's representatives proposed distributing Blast Off's music catalog beyond YouTube, to music streaming platforms such as Spotify, Amazon, and Apple Music. *Id.* Kröner stated that such distribution would be "straightforward" because Downtown's subsidiary was a major distributor with connections to those platforms. *Id.* Downtown's representatives also suggested that Blast Off could operate its own branded distribution platform, which would allow independent artists to upload music, deliver to digital service providers, and view their analytics and royalties. *Id.*

In March 2025, the parties began discussing the specific terms of an agreement. *Id.* ¶ 38. During those discussions, the SAC alleges, Downtown's conduct suggested its intention to "deepen the commercial relationship" with Blast Off. *Id.* ¶ 39. Downtown did not express concerns about the legitimacy of Blast Off's business model. *Id.*

**D. The Agreement**

In August 2025, Adrev assigned the Adrev agreement to Downtown. *Id.* ¶ 40. At the time of assignment, Adrev owed Blast Off approximately $814,000 for July royalties and $836,000 for August royalties. *Id.* By assuming the Adrev agreement, Downtown became obligated to pay those pre-existing amounts. *Id.* ¶ 104.

On August 22, 2025, Blast Off and Downtown entered the Agreement. *Id.* ¶ 41; *see* Dkt. 29-1 ("Agreement"). The SAC alleges that Downtown's earlier statements, related to Downtown's resources and Blast Off's potential for growth, were "material" to Blast Off in deciding to enter an agreement with Downtown instead of pursuing other options or allowing the Adrev agreement to continue. SAC ¶¶ 39, 41.

The relevant provisions of the Agreement are as follows:

***Downtown's Exclusive Rights***: Section 2 provides that Blast Off grants Downtown the exclusive right to monetize Blast Off's sound recording content on YouTube. *Id.* ¶ 44; Agreement § 2.

***Blast Off's Compensation***: Section 3 provides that Downtown will pay to Blast Off: (1) $6 million in advance payments (the "Advances"), spread out over three installments; (2) a $25,000 legal fee contribution to Blast Off's counsel; and (3) monthly revenue share payments equal to 90% of gross revenues until the Advances were recouped, and 95% thereafter. SAC ¶ 44. It further provides that 50% of Blast Off's revenue share would be paid to Blast Off monthly, regardless of the recoupment status of the Advances, with the other 50% applied toward recoupment. *Id.* ¶ 45.

***Indemnification***: Section 6 states that, pending the determination of a third-party claim, cause of action, demand, threat, lawsuit, and proceeding against Blast Off, Downtown may "withhold payments" of Blast Off's share of revenue "in an amount reasonably related to such Claim." Agreement § 6.

***Breach & Termination***: Section 8 governs breach of the Agreement and remedies. SAC ¶ 47. It states, in relevant part:

> Neither Party will be deemed to be in breach of this Agreement unless and until the non-breaching Party gives the other Party written notice specifying in reasonable detail the nature of such breach and the notified Party fails to cure such breach within thirty (30) days (fifteen [15] days with respect to payment of monies) after receipt of such written notice.

*Id.* Section 9(e) provides that either party may terminate "at any time during the Term upon thirty (30) days' prior written notice to the other Party if the other Party has committed a material uncured breach of this Agreement subject to Section 8 thereof." *Id.* ¶ 40.

***Duration***: Section 9 provides that the Agreement has an initial term of 24 months from August 22, 2025 (the "effective date"), which automatically extends until the Advances are fully recouped. *Id.* ¶ 46.

***Downtown's Responsibilities***: Downtown's responsibilities under the Agreement include (1) identifying videos containing Blast Off's music, placing claims on those videos, and monetizing them through advertisements;[3] (2) collecting advertising revenue generated by videos containing Blast Off's music; (3) paying Blast Off its share of revenue on a monthly basis; (4) blocking, tracking, or monetizing Blast Off content, and managing competing claims from other parties; and (5) releasing claims on videos by allowing them to remain live without generating revenue for Blast Off. *Id.* ¶ 50.

On August 29, 2025, consistent with the Agreement, Downtown paid Blast Off the first advance ($3 million) and $25,000 legal fee contribution. *Id.* ¶ 51.

**E. Ongoing Compliance Issues**

Blast Off implemented measures to ensure that creators using Blast Off's tracks comply with YouTube's policies. *Id.* ¶ 57. Blast Off developed and implemented tools powered by artificial intelligence ("AI") to identify potential policy violations and flag problematic content for removal or claim release. *Id.* It also implemented daily validation of new channels and conducted monthly audits of revenue-generating channels. *Id.*

Between May and November 2024, while the Adrev agreement was in place, various compliance issues arose. *Id.* ¶ 58. Blast Off "promptly addressed" these. *Id.* On December 10, 2024, Korn (as a representative of Adrev) identified concerns about creators using Blast Off

---

[3] By placing a claim on a video, Downtown informs YouTube that the video contains Blast Off's music, even though it was not automatically flagged as such by Content ID. SAC ¶ 59 n.13.

content at low or inaudible volumes.[4] *Id.* Blast Off responded "within minutes" and "committed to address[ing] the issue" by requesting that channels play Blast Off's music at audible volumes. *Id.* On February 25, 2025, Whitmire (also as a representative of Adrev) identified one video where Blast Off's music was not clearly audible. *Id.* Blast Off confirmed that it had communicated with creators about proper usage and stated that it would conduct a thorough audit by the end of the following day. *Id.*

After execution of the Agreement, Blast Off continued to work with Downtown to ensure compliance with YouTube's policies. *Id.* ¶ 59. In September 2025, Blast Off was in consistent communication with Downtown employees—the same individuals Blast Off had worked with on compliance issues under the Adrev agreement—regarding claims for specific videos. *Id.* ¶¶ 59–61. For example, on September 22, 2025, Blast Off "proactive[ly]" requested that Downtown release a claim that had been placed on a video. *Id.* ¶ 59.

### F. YouTube's Official Warning and Blast Off's Response

On September 29, 2025, Whitmire sent Blast Off an email (the "Warning Email") stating that Downtown had received an official warning from YouTube's music team that two of Blast Off's tracks were being used in a manner that bypassed or interfered with YouTube's systems, processes, or policies (a prohibited practice known as "circumvention"). *Id.* ¶ 64. Whitmire stated that the cause of the warning was unclear, but hypothesized that it might have been Downtown's manual claiming process. *Id.* ¶ 67. Accordingly, Whitmire stated, Downtown had decided to halt manual claiming pending a meeting with YouTube's team. *Id.*

---

[4] Although the SAC does not elaborate on the problematic nature of this use of Blast Off's content, it appears that such would run afoul of YouTube's policies by enabling Blast Off to collect revenue from the use of a track that was not playing audibly in a video.

That day, Blast Off responded to Whitmire's email. *Id.* ¶ 69. Blast Off stated that the problem was "likely being caused by the influx of 'movie'/unmonetizable channels on blast off that we've [been] having to ban/reject daily," from Korean companies that had been shut down by YouTube. *Id.* Blast Off further stated: "We've rejected 100+ channels that started posting with us over the past few days and we'll need them all white listed and claims released today if possible." *Id.*[5] It sent Downtown a spreadsheet identifying the channels that needed to be white-listed and have claims released. *Id.* ¶ 72 ("it's very important we white label [sic] these channels alongside releasing claims so they can't be monetized again"). Blast Off also noted that it had built an AI system that would "allow us to catch any channels using our music that shouldn't be monetized." *Id.* ¶ 69.

On September 30, 2025, Blast Off informed Downtown that it had done a "full sweep" of the channels that generated more than $1 in revenue up until September 28, 2025. *Id.* ¶ 73. Blast Off sent an updated list identifying 660 channels to be white-listed and claims-released. *Id.*

On October 1, 2025, Blast Off requested that Downtown remove one of its tracks, "Cold Case," from the catalog, because it had noticed many creators using the track where it was barely audible in their shorts. *Id.* ¶ 74. Blast Off stated: "We've been doing a thorough audit and crack down this past week on any usage of our music that could be deemed 'Circumvention' in YouTube's eyes and we take this very seriously." *Id.* The next day, Downtown confirmed it had deactivated "Cold Case." *Id.*

---

[5] "White-listing" involves releasing existing revenue claims from a channel and preventing future monetization of it. SAC ¶ 72.

### G. Downtown's Termination of the Agreement

On October 2, 2025, Downtown sent Blast Off a letter (the "Termination Letter") stating that it had committed a "material breach" of the Agreement by "intentionally circumventing and violating YouTube's monetization policies and terms." *Id.* ¶¶ 78, 80. The letter cited two examples of creators claiming to have used Blast Off's tracks in their videos, where the tracks were in fact inaudible. *Id.* ¶¶ 80–81. It stated that the breach was "not capable of being cured." *Id.* ¶ 85.

The Termination Letter demanded that Blast Off immediately return the $3 million advance. *Id.* ¶ 87. It further stated that Downtown would hold Blast Off's August and September revenue shares "pending a resolution of this matter," and that Downtown would "seek redress and return from Blast Off of all revenues previously paid through to Blast Off in excess of such held revenues." *Id.*

The SAC alleges that the Termination Letter was defective for several reasons. *Id.* ¶ 84. First, it did not "specify[] in reasonable detail" the nature of the breach, as required by Section 8 of the Agreement, instead providing only two examples of problematic videos without addressing Blast Off's wrongdoing or what actions Blast Off should have taken to remedy the breach. *Id.* Second, it did not provide Blast Off with the 30-day cure period required by Section 8. *Id.* ¶ 85. Third, it did not provide evidence of Downtown's actual damages or explain how the identified two instances could constitute a material breach under Section 9. *Id.* ¶ 86.

### H. Subsequent Communications Between Blast Off and Downtown

On October 7, 2025, Blast Off's counsel responded to the Termination Letter, stating that Downtown had failed to provide the required 30-day cure period, failed to establish materiality, ignored Blast Off's remediation efforts, and acted in bad faith. *Id.* ¶ 99.

On October 22, 2025, Downtown responded to Blast Off's letter. *Id.* ¶ 100. It cited, as additional grounds for termination, that: (1) 98% of Blast Off's top assets were circumventing or attempting to circumvent YouTube policies, and (2) more than 40% of Blast Off's total revenue was directly derived from activities that violated YouTube's policies. *Id.* ¶ 100. The letter concluded: "[I]t has become apparent that Blast Off's entire business model relies on the improper circumvention of YouTube's policies." *Id.* ¶ 101.

**I. Downtown's Alleged Motive**

The SAC alleges that Downtown's reasons for termination were "pretextual." *Id.* ¶ 89. Downtown's "true motivations," it alleges, were "financial and strategic." *Id.*

First, the SAC alleges, Blast Off's growth made termination "increasingly attractive" to Downtown. *Id.* ¶ 90. In September 2025, Blast Off's gross revenue was approximately $1,280,928, which represented the highest growth month in Blast Off's history. *Id.* ¶ 52. If its business continued at that rate, Blast Off would fully recoup the $3 million advance by January 2026, at which point Downtown's revenue share would be reduced from 10% to 5%. *Id.* ¶ 53. That level of growth would also increase Downtown's operational burdens, because there would be more claims to file, content to manage, and revenue to track. *Id.* ¶ 90. Downtown thus terminated the agreement "to escape an increasingly burdensome and decreasingly profitable bargain." *Id.*

Second, the SAC alleges, Downtown faced regulatory issues related to an ongoing merger—issues that termination of the Agreement stood to help mitigate. *Id.* ¶ 91. In December 2024, Downtown's parent company announced a $775 million acquisition by Virgin Music Group, a division of Universal Music Group ("UMG"). *Id.* ¶¶ 15, 91. In July 2025, the European Commission opened an investigation into the acquisition based on concerns about

reduced competition. *Id.* ¶ 91. In November 2025, one month after the Termination Letter, the Commission escalated its investigation. *Id.* The SAC alleges: "Downtown's decision to terminate was influenced by the timing and regulatory scrutiny related to the UMG acquisition." *Id.* ¶ 92.

### J. Additional Harms to Blast Off

In addition to the allegedly wrongful termination, the SAC alleges that Downtown has engaged in the following conduct, causing further harm to Blast Off.[6]

***Withholding of Revenue***: Downtown withheld approximately $1.65 million worth of revenues from July and August 2025. *Id.* ¶ 104. 90% of those revenues were payable to Blast Off under the Adrev agreement. *Id.*

***Ceasing of Monetization Services***: Downtown ceased making Content ID claims for Blast Off's content, resulting in Blast Off's loss of revenue and loss of royalties from performing rights organizations. *Id.* ¶¶ 105, 118.

***Delisting***: Downtown delisted Blast Off's catalog, which means that none of the catalog's tracks can be used by creators until they are re-listed. *Id.* ¶ 106. This has led creators to migrate to competitors and forced Blast Off to commission new music. *Id.* ¶¶ 113, 116. The SAC alleges that the consequences of delisting are "devastating." *Id.* ¶ 106. When a catalog has been removed by a partner, licensing industry participants presume that the underlying rights in the catalog are defective, depressing licensing demand and long-term asset value. *Id.* ¶¶ 108–09. The SAC alleges that these consequences have already materialized: on October 4, 2025, Blast Off contacted 24 potential partners, all of whom refused to work with Blast Off on the delisted

---

[6] As of the SAC's filing, Downtown had not withdrawn the termination, released the frozen royalties, or withdrawn its demand for return of the $3 million advance. SAC ¶ 103.

tracks. *Id.* ¶ 115. Although Blast Off's catalog may be re-listed, such requires YouTube's manual review and re-approval, which is a time-consuming and potentially unsuccessful process. *Id.* ¶ 107.

Based on these harms, the SAC estimates, Blast Off's damages are approximately $375 million. *Id.* ¶ 119.

## II. Procedural History

On November 10, 2025, Blast Off filed the Complaint, Dkt. 1, which it amended on November 21, 2025, Dkt. 13 ("First Amended Complaint"). On January 16, 2026, Downtown moved to dismiss the First Amended Complaint. Dkt. 21. On January 22, 2026, the Court issued an amend-or-oppose order, directing Blast Off to file an amended complaint or serve an opposition to the motion to dismiss. Dkt. 27.

On February 6, 2026, Blast Off filed the SAC and supporting exhibits. Dkt. 29. On February 27, 2026, Downtown moved to dismiss the SAC, Dkt. 36 ("Mot."), and filed a declaration with supporting exhibits, Dkt. 34. On March 13, 2026, Blast Off opposed. Dkt. 39 ("Opp'n"). On March 20, 2026, Downtown replied. Dkt. 44 ("Reply").[7]

## III. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that

---

[7] The SAC and briefing in connection with the motion to dismiss have all been filed on the docket in redacted and unredacted forms. The parties have filed motions to seal these materials. *See* Dkts. 35, 38, 43. The Court resolves these motions by separate order.

This decision draws on the sealed materials and makes several very brief references to selected excerpts that were redacted in the parties' submissions. The Court was careful to measure its words so as not to compromise commercially sensitive matters.

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

For claims alleging fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard. Such claims must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a complaint must "allege facts that give rise to a strong inference of fraudulent intent." *Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (summary order) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). Specifically, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank*, 459 F.3d 273, 292–93 (2d Cir. 2006) (citation omitted).

## IV. Discussion

### A. Fraudulent Inducement

To state a claim for fraudulent inducement under New York law, a complaint must allege that the defendant "made a misrepresentation of a material fact, that was known to be false and intended to be relied on when made, and that the plaintiff justifiably relied on that

misrepresentation to its injury." *Amida Cap. Mgmt. II v. Cerberus Cap. Mgmt.*, 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (citing *Braddock v. Braddock*, 871 N.Y.S.2d 68, 70 (1st Dep't 2009)).

The SAC alleges fraudulent inducement based on representations made by Downtown's representatives in two meetings before execution of the Agreement. On January 9, 2025, it alleges, those representatives stated that Downtown maintained a strong partnership with YouTube; Downtown's management systems were "at top tier-status with YouTube"; Downtown had "expended significant time, effort, and resources" to keep its systems in compliance with YouTube's policies; and Downtown would be available to assist Blast Off in navigating issues with YouTube. SAC ¶¶ 36, 125. The SAC further alleges that, on February 6, 2025, Downtown's representatives acknowledged Blast Off's growth; congratulated Blast Off on its success; expressed excitement about the partnership between Blast Off and Downtown; and proposed expanding Blast Off's business beyond YouTube. *Id.* It alleges that, in the months between February and August 2025, Downtown "continued to reaffirm its commitment to the partnership" with Blast Off. *Id.* ¶ 126.

The SAC, however, has not plausibly alleged that any of these representations were "known to be false . . . when made." *Amida Cap. Mgmt.*, 669 F. Supp. 2d at 444. As alleged, Downtown's statements consisted of claims about the strength of its relationship with YouTube, ideas for Blast Off's business expansion, and offers of future assistance. They were thus statements of opinion and expressions of "present or future expectations." *Phx. Cos. v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 593 (S.D.N.Y. 2021) (quoting *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13 Civ. 4650, 2015 WL 769573, at *6 (S.D.N.Y. Feb. 24, 2015)). Such are "nearly always insufficient to give rise to a claim for

fraudulent inducement." *Id.*; *see Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 134 (2d Cir. 2008) (noting "general principle that statements of opinion generally cannot constitute fraud"); *Greenberg v. Chrust*, 282 F. Supp. 2d 112, 121 (S.D.N.Y. 2003) ("Courts have found parties' assessment of their own abilities and successes to be non-actionable statements of opinion when rendered in good faith.").

Blast Off's arguments to the contrary are unavailing. First, Blast Off argues that Downtown's misrepresentations were "statements of fact," not expressions of opinion. Opp'n at 17 (cleaned up). But even if they were statements of fact, the SAC has not plausibly pled that they were false. For example, there are no allegations to the effect that Downtown did not, in fact, have the relationship with YouTube that it touted. *See, e.g.*, *Golden Archer Invs., LLC v. Skynet Fin. Sys.*, No. 11 Civ. 3673, 2012 WL 123989, at *8 (S.D.N.Y. Jan. 3, 2012) (dismissing fraudulent inducement claim where complaint "fails to explain with particularity how certain of these statements were false"); *Coppelson v. Serhant*, No. 1 Civ. 8481, 2021 WL 148088, at *8 (S.D.N.Y. Jan. 15, 2021) (same, where "entirely absent from the complaint are any allegations of fact supporting that the alleged 'inducements' were false at the time they were made"). Second, the SAC alleges that the "obvious falsity of these statements is demonstrated by the speed with which [Downtown] terminated the Agreement." SAC ¶ 129. But Downtown's purported failure to carry out its promises does not imply its promises were false when they were made. *See Exceed Holdings LLC v. Chi. Bd. Options Exch. Inc.*, No. 17 Civ. 8078, 2018 WL 4757961, at *4 (S.D.N.Y. Sept. 30, 2018) ("mere unfulfilled promissory statements as to what will be done in the future are not actionable" (cleaned up)); *Phx. Cos.*, 554 F. Supp. at 595 (allegations premised on "lack of intent to abide by its representations in the future . . . are insufficient to establish materially false representations").

Because the falsity element is implausibly pled, the SAC's fraudulent inducement claim fails. The Court accordingly dismisses that claim.[8] *See, e.g.*, *Exceed Holdings LLC*, 2018 WL 4757961, at *4 (dismissing fraudulent inducement claim, because "only facts alleged in support are that after making the foregoing remarks, no investment was ultimately completed"); *Rostami v. Open Props, Inc.*, No. 22 Civ. 3326, 2023 WL 137748, at *4 (S.D.N.Y. Jan. 9, 2023) (same, where "most of the[] statements are either promissory in nature or constitute mere puffery, neither of which can form the basis of a fraudulent inducement claim"); *see also Bongiorno v. Baquet*, No. 20 Civ. 7288, 2021 WL 4311169, at *20 (S.D.N.Y. Sept. 20, 2021) ("allegation of fraudulent representation is simply conclusory" where complaint did not plead facts other than that defendant did not carry out promises); *Diesenhouse v. Soc. Learning & Payments, Inc.*, No. 20 Civ. 7436, 2022 WL 3100562, at *8 (S.D.N.Y. Aug. 3, 2022) (that representations about future investors and potential customers "did not come to fruition does not mean that [defendant] had a fraudulent intent").

### B. Breach of Contract

The elements of breach of contract are "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

---

[8] Because the Court finds this element implausibly pled, it does not reach defendants' remaining arguments for dismissal of the fraudulent inducement claim. *See* Mot. at 9–14 (arguing SAC fails to satisfy Rule 9(b) pleading standard or allege intent to defraud; SAC impermissibly relies on oral representations not in the Agreement; and fraudulent inducement claim is duplicative of breach of contract claim).

Downtown argues that the third element—defendants' breach of contract—has not been plausibly pled. Mot. at 14. That is incorrect. The SAC's allegations support various breaches of the Agreement by Downtown.

The SAC plausibly alleges a breach of the Agreement's notice-and-cure provision. That provision states that neither party will be deemed in breach "unless and until the non-breaching Party gives the other Party written notice specifying in reasonable detail the nature of such breach and the notified Party fails to cure such breach within thirty (30) days . . . after receipt of such written notice." SAC ¶ 47. The SAC alleges that, on October 2, 2025, Downtown sent Blast Off a letter "purporting to terminate the Agreement immediately." *Id.* ¶ 78 (emphasis omitted). The Termination Letter, the SAC alleges, stated that Blast Off had committed a material breach of the Agreement by circumventing YouTube's policies, and that the breach was "not capable of being cured." *Id.* ¶¶ 80, 85. It alleges that the letter "cited only two examples of allegedly problematic videos," and thus did not provide "reasonable detail" as to the nature of the breach. *Id.* ¶¶ 81, 84 (emphasis omitted). It further alleges that the Termination Letter did not provide Blast Off any time to cure the alleged breach, let alone the 30-day period required by the Agreement. *Id.* ¶ 85.

Under New York law, notice-and-cure provisions are "enforced as written." *Flawless Style LLC v. Saadia Grp. LLC*, No. 23 Civ. 2354, 2023 WL 3687782, at *3 (S.D.N.Y. May 26, 2023) (quoting *E. Empire Constr. Inc. v. Borough Constr. Grp. LLC*, 156 N.Y.S.3d 148, 152 (1st Dep't 2021)); *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 434 (2d Cir. 2011). Because the SAC's allegations support that Downtown attempted to terminate the Agreement without providing the contractually required notice and opportunity to cure, it has alleged Downtown's breach of the Agreement. *See, e.g.*, *Filmline (Cross-Country) Prods., Inc. v. United*

*Artists Corp.*, 865 F.2d 513, 519 (2d Cir. 1989) ("since [defendant's] purported termination was in violation of the terms of the Agreement, it was inoperative and plaintiffs are entitled to recover for breach of contract"); *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) (defendant "committed a material breach by terminating the Agreement . . . in contravention of [the Agreement's] 30 day notice period"); *E. Empire Constr. Inc.*, 156 N.Y.S.3d at 152 (granting plaintiff summary judgment on breach of contract claim premised on termination without notice to cure).

Downtown argues that compliance with the notice-and-cure provision would have been futile because (1) Blast Off's conduct "makes clear that it would not have sought to cure," and (2) "any attempt to cure would be impossible." Mot. at 16–17; *see also Sea Tow Servs. Int'l, Inc. v. Pontin*, 607 F. Supp. 2d 378, 389 (E.D.N.Y. 2009) ("adherence to the cure provision of a contract is not required where it would be a futile act"). Both arguments are contradicted by the SAC's allegations.

First, the SAC supports that Blast Off had a history of remedying compliance issues and took immediate steps in response to the Warning Email. Under the Adrev agreement, the SAC alleges, Blast Off had "promptly" addressed concerns about creators using Blast Off content at low or inaudible volumes. SAC ¶ 58. And Blast Off continued to collaborate with many of the same individuals on compliance issues after the Agreement was executed, with Blast Off and Downtown exchanging emails regarding manual claims, and Blast Off proactively requesting Downtown to release a claim on a video. *Id.* ¶ 59. The SAC alleges that, upon Blast Off's receipt of the Warning Email, it responded within 15 minutes with "a detailed explanation and proactive solutions," such as Blast Off's AI flagging system and white-listing of problematic channels. *Id.* ¶ 69. Three days later, the SAC alleges, Blast Off sent Downtown a spreadsheet

identifying the problematic channels to be white-listed, and the day after that, Blast Off sent Downtown an updated spreadsheet, stating that it had done a "full sweep of all channels that have generated more than $1 in revenue up until September 28th." *Id.* ¶¶ 72–73. The SAC further alleges that, on October 21, 2025, Blast Off, of its own accord, requested that Downtown take down one of its tracks due to a concern that it could be used for circumvention. *Id.* ¶ 74. Blast Off wrote: "We've been doing a thorough audit and crack down this past week on any usage of our music that could be deemed 'Circumvention' in YouTube's eyes and we take this very seriously." *Id.*

These allegations support that Blast Off assumed responsibility for compliance issues with respect to its content and was willing to take measures to remedy them. This case thus contrasts with those on which Downtown relies, in which defendants failed to take responsibility for their alleged breaches and willfully continued infringing activity.[9] *See, e.g.*, *City of New York v. Tavern on the Green Int'l LLC*, 351 F. Supp. 3d 680, 693 (S.D.N.Y. 2018) ("no need to wait for twenty business days in light of [plaintiff's] insistence" that it was in compliance with agreement and "continued infringement"); *Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 482 (E.D.N.Y. 2020) ("compliance with the notice-and-cure provision would be useless with respect to the alleged error in this case, given that Defendant was aware of the charges and insists that the overdraft fees are not, in fact, errors"); *DeSimone v. Select Portfolio Servicing, Inc.*, 748 F. Supp. 3d 136, 154 (E.D.N.Y. 2024) (complaint "adequately pled futility"

---

[9] Downtown argues that, upon receipt of the Termination Letter, Blast Off "disputed that it was in breach and made no attempt to explain how it could possibly cure the pervasive problems." Mot. at 17. But Blast Off's *response* to the Termination Letter cannot justify Downtown's failure, in that letter, to provide notice or an opportunity for Blast Off to cure the alleged breach.

where plaintiff was "aware of the charges but insisted" that it was in compliance with the agreement (cleaned up)).

Second, as to Downtown's argument that a cure was "impossible," the SAC's allegations are to the contrary. Downtown argues that Blast Off's business model was such that "violations of YouTube's policies were endemic to Blast Off's catalog and could not be cured by a single act and certainly not within 30 days." Mot. at 17–18. But the SAC alleges that the issue that prompted the Warning Email was isolated and traceable to the "influx" of unauthorized Korean channels. SAC ¶ 69. It further alleges the availability of various remedies, such as AI-powered compliance tools, white-labeling of problematic channels, and removing tracks at risk of being used for circumvention—many of which it articulated in response to the Warning Email. SAC ¶¶ 69, 72–73, 75, 85. Some of these, the SAC alleges, had been effective under the Adrev agreement. *Id.* ¶ 58. These allegations, which must be credited on this motion, contradict Downtown's claim of impossibility. *See, e.g.*, *Decorative Hardware Studio, Inc. v. Clawfoot Supply LLC*, No. 12 Civ. 3156, 2014 WL 2766548 at *5 (S.D.N.Y. June 18, 2014) (no futility where, in response to past cure notices, defendant had removed allegedly infringing content); *E. Empire Constr. Inc.*, 156 N.Y.S.3d at 152 (same, where plaintiff's alleged default "constitute[d] nothing more than defective performance, which is 'the very situation to which the cure provision was intended to apply,'" and there was "no evidence that the defects were impossible to cure" (citation omitted)).

Accordingly, the Court finds it plausibly pled that Downtown breached the notice-and-cure provision.

The Court also finds other breaches of the Agreement adequately pled. The SAC alleges, *inter alia*, that Downtown failed to maintain Content ID claims based on Blast Off's content (in

violation of Section 2); failed to pay earned royalties (Section 3); and improperly withheld Blast Off's revenues (Sections 3 and 6). SAC ¶¶ 138–41. Downtown's counterarguments are unavailing. First, Downtown argues that it did not have an obligation to maintain Blast Off's Content ID claims where such claims "aided violations of YouTube's terms." Mot. at 15. But, at the motion to dismiss stage, all reasonable inferences must be drawn in favor of Blast Off. The SAC alleges that there were issues with "only two videos out of hundreds of thousands of videos using Blast Off's 800 tracks," and that creators—not Blast Off—were responsible for these policy violations. SAC ¶¶ 5, 143. The Court thus cannot find that continued maintenance of Blast Off's numerous other claims would have required Downtown to aid and abet circumvention. Second, Downtown argues that its failure to pay and/or withholding of royalties and revenues was justified because the Agreement's indemnification provision allowed it to "withhold payments" to Blast Off "in an amount reasonably related" to a third-party claim, cause of action, demand, threat, or lawsuit. Mot. at 16 (quoting Agreement § 6). But whether the amount withheld was "reasonably related" to the two videos flagged by YouTube, and whether the warning from YouTube constituted such a "claim," are not fit for resolution on this motion. *See, e.g.*, *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) ("At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous."); *Populus Media, Inc. v. Erb*, No. 34 Civ. 4160, 2024 WL 1313493, at *4 (S.D.N.Y. Mar. 26, 2024) ("Plaintiff's contract claim should not be dismissed based on Defendant's assumed meaning of key contractual language alone." (emphasis omitted)). Each of these breaches thus is also plausibly pled.

Because the SAC plausibly alleges breaches by Downtown and the other elements of its breach of contract claim are not disputed, the Court denies the motion to dismiss with respect to

this claim. *See, e.g.*, *Bressler*, 977 F.2d at 727; *E. Empire Constr. Inc.*, 156 N.Y.S.3d at 151–52; *Erb*, 2024 WL 1313493, at *4.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing

Under New York law, "a duty of good faith and fair dealing is implied in every contract," *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 37 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) (summary order), and requires that neither party "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (citation omitted). "Said simply, 'the covenant requires the parties to perform under the contract in a reasonable way.'" *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, 2026 WL 1502410, at *3 (N.Y. May 28, 2026) (quoting *Cordero v. Transamerica Annuity Serv. Corp.*, 39 N.Y.3d 399, 410 (2023)). But "the implied covenant is not without limits," and "[c]ourts will imply a covenant 'only in aid and furtherance of other terms of the agreement of the parties.'" *Id.* (quoting *Singh v. City of New York*, 40 N.Y.3d 138, 146 (2023)).

Downtown argues that the SAC's implied covenant claim should be dismissed because it is duplicative of its breach of contract claim. Mot. at 20. That is partially correct. The implied covenant and breach of contract claims are largely based on the same allegations. *Compare* SAC ¶¶ 138–44 (breach of contract based on failure to maintain Content ID claims, resulting in competing claims by third parties; failure to pay revenues and remit earned royalties; and wrongful termination of the Agreement), *with id.* ¶ 149 (breach of implied covenant claim based on allowing competing claims; withholding of royalties; and pretextual termination of Agreement that "ignor[ed]" Blast Off's compliance efforts). Insofar as the allegations underlying the implied covenant claim overlap with the breach of contract claim, that former

claim cannot stand. *See, e.g.*, *L-7 Designs, Inc.*, 647 F.3d at 434 n.17 ("Because [plaintiff's] claim for breach of the implied covenant of good faith and fair dealing . . . is based on the same facts as its claim for breach of contract, it should have been dismissed as redundant."); *Benihana of Tokyo, LLC*, 259 F. Supp. 3d at 37 (dismissing implied covenant claim, which "impermissibly duplicates [plaintiff's] breach of contract claim").

There is at least one allegation, however, encompassed by the SAC's implied covenant claim that is outside its breach of contract claim. The SAC alleges that Downtown "[p]ermanently delist[ed] Blast Off's songs from YouTube Shorts library." SAC ¶ 149. Downtown argues that "this very conduct is squarely addressed by Section 9(f) of the Agreement." Reply at 7. But that section provides that, upon the Agreement's effective termination, "all rights granted by [Blast Off] in this Agreement will terminate and revert to [Blast Off]." Agreement § 9(f). It does not permit Downtown to permanently delist Blast Off's catalog upon termination. The SAC thus alleges a "bad faith act[] taken by one party that do[es] not violate an express term included in the contract." *111 W. 57th Inv. LLC*, 2026 WL 1502410, at *7.[10] Such is adequate to state a nonduplicative claim for breach of the implied covenant. *See, e.g.*, *Taco, Inc. v. Am. Home Assurance Co.*, No. 24 Civ. 7041, 2025 WL 2419707, at *5 (S.D.N.Y. Aug. 21, 2025) (implied covenant claim not duplicative where "allegations suggest a potential intentional subversion of the contract from [defendant], as opposed to a failure to

[10] "One factor courts consider in assessing whether claims are duplicative is the relatedness of the damages sought in each claim." *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 20 Civ. 5015, 2021 WL 3668092, at *4 (S.D.N.Y. Aug. 17, 2021). The SAC appears to seek at least partially distinct damages on its breach of contract and implied covenant claims. *Compare* SAC ¶ 145 (as to breach of contract, "Blast Off has suffered substantial damages as a direct and proximate result of Defendants' conduct"), *with id.* ¶ 151 (as to breach of implied covenant, Blast Off "has suffered substantial damages as a direct and proximate result of Defendants' conduct . . . , *including for Defendants' destruction of Blast Off's catalog on YouTube and platform business*" (emphasis added)).

execute the terms of the contract itself"); *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 20 Civ. 5015, 2021 WL 3668092, at *5–6 (S.D.N.Y. Aug. 17, 2021) (same, where implied covenant claim was based on defendant's "bad faith decision," which may not have "breach[ed] the terms of the contract in a technical sense" (citation omitted)).

Accordingly, the Court denies the motion to dismiss the implied covenant claim, but solely to the extent that it is premised on Downtown's delisting Blast Off's catalog. *See, e.g.*, *Phoenix Cos.*, 554 F. Supp. at 587–88 (although implied covenant counterclaim is "partially duplicative," "there are sufficiently distinct allegations contained in a subset of [the counterclaim] to allow that subset to proceed at this stage as a separate claim"); *MDC Corp. v. John H. Harland Co.*, 228 F. Supp. 2d 387, 395 (S.D.N.Y. 2002) (implied covenant claim adequately alleged to extent it rested on allegations distinct from breach of contract claim).

**D. Unjust Enrichment**

Unjust enrichment is "a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 54 (2d Cir. 2011) (quoting *Goldman v. Metro. Life Ins. Co.*, 807 N.Y.S.2d 583, 587 (2005)). It is "not a catchall cause of action to be used when others fail," and "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 944 N.Y.S.2d 732, 740 (2012).

The SAC's unjust enrichment claim fails for at least two reasons.

First, "[w]hen 'a matter is controlled by contract,' the plaintiff has no valid claim for unjust enrichment under New York law." *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014) (quoting *Goldman*, 5 N.Y.3d at 573). Here, the parties do not dispute that the Agreement is a valid contract. *See* Mot. at 21; Opp'n at 1. The unjust enrichment claim thus

cannot stand. *See, e.g.*, *Schultz v. Gershman*, 891 N.Y.S.2d 323, 324 (1st Dep't 2009) ("Plaintiffs' unjust enrichment cause of action is barred by the existence of the contract between the parties."); *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000) ("Because both parties agree that a valid and enforceable contract exists between them, Plaintiff may not plead the quasi-contractual theory of unjust enrichment.").

Second, the unjust enrichment claim is premised on the allegations that Downtown wrongfully terminated the Agreement, withheld revenues, refused to pay Blast Off's earned royalties, and demanded a return of previously paid royalties. SAC ¶ 156. These are the same allegations that underpin the breach of contract claim. *See id.* ¶¶ 138–44. The SAC's unjust enrichment claim thus impermissibly duplicates the contract claim. *See, e.g.*, *AFP Mfg. Corp. v. AFP Imaging Corp.*, No. 17 Civ. 3292, 2018 WL 3329859, at *11 (S.D.N.Y. July 6, 2018) (unjust enrichment claim duplicative where "the only evidence Plaintiff offers in support its unjust enrichment claim is a restatement of the evidence that it provided in furtherance of its breach of contract claim"); *Presnall v. Analogic Corp.*, No. 17 Civ. 6662, 2018 WL 4473337, at *11 (S.D.N.Y. Sept. 18, 2018) (dismissing unjust enrichment claim as "redundant to [plaintiffs'] breach of contract claim").

Accordingly, the Court dismisses the SAC's unjust enrichment claim. *See, e.g.*, *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 354 (S.D.N.Y. 2021) (Engelmayer, J.) (dismissing unjust enrichment claim where "there is no doubt as to the existence of a valid contract that governs this dispute" and claim "overlap[s] entirely with [plaintiff's] contract claims"); *Gravier Prods., Inc. v. Amazon Content Servs., LLC*, No. 19 Civ. 1169, 2019 WL 3456633, at *5–6 (S.D.N.Y. July 31, 2019) (similar).

### E. Conversion

To state a claim for conversion, "a plaintiff must show: (1) the property subject to conversion is 'a specific identifiable thing;' (2) plaintiff had 'ownership, possession or control' over the property before its conversion; and (3) defendant 'exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (citation omitted).

The SAC's conversion claim is based on two sets of allegations. Neither supports a plausible conversion claim.

First, the SAC alleges, Downtown has exercised unauthorized dominion and control by refusing to pay Blast Off its share of revenues, including for amounts earned under the Adrev agreement. SAC ¶ 161. But that is the same conduct that underlies the SAC's breach of contract claim. *See id.* ¶¶ 140–41 (alleging breach of Sections 3 and 6 of the Agreement, based on Downtown's improper withholding of revenues). It does not, as Blast Off contends, save the conversion claim that some of the revenues alleged to have been wrongfully withheld were earned under the Adrev agreement. *See* Opp'n at 23. The Agreement states that the Adrev agreement "was assigned by Adrev" to Downtown, and that Downtown and Blast Off "hereby wish to terminate the Original Agreement and continue their business relationship under the terms of this Agreement." Agreement at 1. The conversion claim, insofar as it is premised on withheld revenues, impermissibly duplicates the breach of contract claim. *See Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 431 (S.D.N.Y. 2004) ("A conversion claim . . . that merely duplicates a breach of contract claim is not actionable.").

Second, the SAC alleges that Downtown exercised unauthorized dominion and control over Blast Off's property by delisting its songs from YouTube's library. SAC ¶ 161. This

allegation, although not a basis for the SAC's breach of contract claim, is inadequate to support a claim of conversion. The SAC alleges various harms that flowed from the delisting of Blast Off's catalog. *See Id.* ¶¶ 106–09, 167. But it does not allege that the delisting interfered with Blast Off's "legal ownership or an immediate superior right of possession" to the catalog. *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 253 (S.D.N.Y. 2002) (citation omitted). On the contrary, it alleges that, after the catalog was delisted, Blast Off "contacted 24 potential partners," who "refused to work with Blast Off on the de-listed" tracks. SAC ¶ 115. It thus supports that Blast Off retained possession, control, and ownership of the catalog.

Because the conversion claim fails on both bases, the Court grants the motion to dismiss that claim. *See, e.g.*, *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 535 (S.D.N.Y. 2011) ("An essential element of conversion is 'unauthorized dominion' to the exclusion of the rights of the plaintiff." (citation omitted)); *Reis, Inc. v. Spring11 LLC*, No. 15 Civ. 2836, 2016 WL 5390896, at *11 (S.D.N.Y. Sept. 26, 2016) (dismissing conversion claim where defendant's actions "did not in any way deprive Plaintiffs of their ability to access and use their own reports"); *Obeid v. Mack*, No. 14 Civ. 6498, 2016 WL 1069678, at *5 (S.D.N.Y. Mar. 17, 2016) (same, where "there is no plausible allegation that the original network did not remain in the possession of, and accessible to, [plaintiff], or that [defendant] interfered with [plaintiff's] possession").

### F. Tortious Interference with Business Relations

To state a claim for tortious interference with business relations, a complaint must allege that "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or

improper means; and (4) the relationship is injured." *Goldhirsh Grp., Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997) (citing *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994)). The complaint must allege "conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan*, 785 N.Y.S.2d 359, 363 (2004).

The SAC alleges tortious interference based on Downtown's delisting of Blast Off's catalog. SAC ¶ 167. It alleges that such made it "impossible" for content creators to continue using Blast Off's music and interfered with Blast Off's "ongoing business relationship with thousands of content creators." *Id.* ¶¶ 165–67. And, it alleges, Downtown "acted with the improper purpose of destroying Blast Off's business to prevent Blast Off from working with competing monetization services and to eliminate any potential business threat from Blast Off." *Id.* ¶ 168.

Missing from the SAC, however, is any allegation that Downtown "directed" its conduct at the content creators. *Carvel Corp.*, 785 N.Y.S.2d at 363. The SAC supports that harm to Blast Off's relationship with creators occurred as a result of Downtown's delisting of the catalog, but not that such harm was the delisting's intended purpose. *See Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 602 (S.D.N.Y. 2017) (Engelmayer, J.) (complaint did not allege wrongful conduct "directed at any third party," where "[a]ny injury to these relationships, as pled, was no more than an incidental byproduct"). That is inadequate to support a tortious interference claim.

Blast Off argues that "Downtown did not need to contact each creator; it simply eliminated the platform through which those relationships operated." Opp'n at 24. But the deficiency as to this claim is not that the SAC fails to allege that Downtown contacted every creator. It is that the SAC fails to allege it contacted *any* creator, or took any action targeting

them. *Cf. Purgess*, 33 F.3d at 142 (defendants reported plaintiff's termination for malpractice to former employer, injuring his relationship with that institution); *John Mezzalingua Assocs., LLC v. Braunschweig*, No. 519 Civ. 368, 2020 WL 210299, at *5 (N.D.N.Y. Jan. 14, 2020) (complaint plausibly pled interference by alleging defendant recommended that third party award contract to plaintiff's competitor).

The SAC thus has not plausibly pled a tortious interference claim. Accordingly, the Court dismisses that claim. *See, e.g.*, *Conflict Int'l, Inc. v. Komorek*, No. 23 Civ. 2165, 2024 WL 1347577, at *14 (S.D.N.Y. Mar. 29, 2024) (dismissing tortious interference claim where allegations "do not show that any of [defendant's] acts were directed at [plaintiff's] clients"); *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) (dismissing tortious interference claim, where there were "no allegations" that defendants "had any contact with" plaintiffs' customers or "tried to convince the customers to make contracts with them rather than" plaintiffs); *see also Com. Lubricants, LLC v. Safety-Kleen Sys., Inc.*, No. 14 Civ. 7483, 2017 WL 3432073, at *17 (E.D.N.Y. Aug. 8, 2017) ("claim for tortious interference with prospective economic advantage fails because there is no evidence that Defendant directed any improper or wrongful conduct toward a third party with which Plaintiff had an existing business relationship"); *Carvel Corp.*, 785 N.Y.S.2d at 363 (evidence did not support tortious interference claim, "because the economic pressure that must be shown is" pressure on third party, not plaintiff).

### G. Injunctive & Declaratory Relief

The SAC brings freestanding claims for declaratory and injunctive relief. SAC ¶¶ 172–83. Those, however, are "remedies, not causes of action." *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010). And the SAC, in its prayer for relief, seeks a judicial

declaration and an injunction. SAC at 53–54. Accordingly, the Court dismisses the SAC's seventh and eighth claims, without prejudice to Blast Off's right to seek declaratory and injunctive relief in connection with its two well-pled claims, for breach of contract and the implied covenant. *See, e.g.*, *Smith v. New Line Cinema*, No. 3 Civ. 5274, 2004 WL 2049232, at *5 (S.D.N.Y. Sept. 13, 2004) (dismissing claim for injunctive relief because plaintiff "seeks injunctive relief as part of his 'Prayer for Relief' and there is no separate cause of action for an injunction"); *TufAmerica, Inc. v. Universal Music Publ'g, Inc.*, No. 24 Civ. 2585, 2025 WL 2700249, at *2 (S.D.N.Y. Sept. 23, 2025) (dismissing injunctive relief and declaratory judgment counts "to the extent that they are pled as independent causes of action"); *Spectre Air Cap., LLC v. WWTAI AirOpCo II DAC*, 737 F. Supp. 3d 195, 211 (S.D.N.Y. 2024) (dismissal of claims for declaratory and injunctive relief "should not be construed as a finding that Plaintiff may not seek a declaratory judgment [or injunction] as a remedy for its surviving claims").[11]

## CONCLUSION

For the reasons above, the Court denies the motion to dismiss the SAC's breach of contract claim and implied covenant claim, the latter to the extent it is based on Downtown's alleged delisting of Blast Off's catalog. The Court, however, grants the motion to dismiss the balance of the SAC's claims.

An order will issue shortly as to next steps in this litigation and the parties' motions to seal.

[11] Downtown moved to strike or dismiss the SAC's request for consequential and punitive damages, Mot. at 25, based on its fraudulent inducement, conversion, and tortious interference claims. SAC ¶¶ 133, 163, 171. Because the Court dismisses those claims, this issue is moot.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: August 5, 2026
New York, New York